**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

TAMIKA LAWTON, AS MOTHER
AND NATURAL GUARDIAN OF J. L., A MINOR

              Plaintiff,

v.

THE KRAFT HEINZ COMPANY, MONDELEZ
INTERNATIONAL, INC., POST HOLDINGS, INC.,
THE COCA-COLA COMPANY, PEPSICO, INC.,
GENERAL MILLS, INC., NESTLE USA, INC.,
KELLANOVA, WK KELLOGG CO., MARS
INCORPORATED, INC., and CONAGRA
BRANDS, INC.

              Defendants.

No. 1:26-cv-44 LG-RPM
ORAL ARGUMENT REQUESTED

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OMNIBUS MOTION TO
DISMISS PLAINTIFF'S COMPLAINT</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................4

LEGAL STANDARD ........................................................................................................7

ARGUMENT ...................................................................................................................8

I.    THE COMPLAINT IS AN IMPERMISSIBLE SHOTGUN PLEADING..............8

II.   ALL OF PLAINTIFF'S CLAIMS FAIL FOR LACK OF CAUSATION ............11

      A.    Plaintiff Fails To Adequately Identify The Products At Issue In
            This Case.................................................................................................12

      B.    Plaintiff Does Not Plausibly Allege Either General Or
            Specific Causation ..................................................................................15

III.  PLAINTIFF'S CLAIMS ARE PREEMPTED BY FEDERAL LAW ...................20

      A.    USDA Preemption Bars Claims Regarding Meat And
            Poultry Products......................................................................................21

      B.    Plaintiff's Vague Pleading Improperly Attempts To Evade
            FDA Preemption ......................................................................................24

IV.   PLAINTIFF'S CLAIMS ARE BARRED BY THE
      FIRST AMENDMENT.......................................................................................26

V.    PLAINTIFF'S CAUSES OF ACTION FAIL FOR
      CLAIM-SPECIFIC REASONS ..........................................................................29

      A.    Plaintiff's Failure-To-Warn/Mississippi Products Liability Act
            Claim (Count I) Fails For Lack Of Duty And Warning Causation............29

      B.    Plaintiff's Design Defect/Mississippi Products Liability Act Claim
            (Count II) Fails Because She Does Not Plead Either A Defect Or
            The Existence Of An Alternative, Feasible Design ..................................32

      C.    Plaintiff's Fraud And Deception-Based Claims (Counts III-V) Fail
            For Multiple Reasons...............................................................................34

i

**TABLE OF CONTENTS–CONTINUED**

**Page**

1.    Plaintiff does not adequately allege any false statement
or reliance..................................................................................34

2.    Plaintiff's fraudulent concealment claim also fails for lack
of duty ........................................................................................38

D.    Plaintiff's Conspiracy (Count VI) And Aiding and
Abetting/Concerted Action (Count VII) Claims Also Fail For
Multiple Reasons ....................................................................................39

1.    Plaintiff has not alleged an underlying tort...................................40

2.    Plaintiff does not plausibly allege an agreement to accomplish
an unlawful result.........................................................................40

VI.    THE COURT SHOULD DISMISS ALL OF PLAINTIFF'S CLAIMS
AGAINST MONDELĒZ INTERNATIONAL AND POST HOLDINGS
FOR LACK OF PERSONAL JURISDICTION ....................................................43

CONCLUSION............................................................................................................46

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*3M Co. v. Johnson*,
   895 So. 2d 151 (Miss. 2005) ................................................................................31, 32

*Alexander v. Global Tel Link Corp.*,
   2018 WL 3469180 (S.D. Miss. July 18, 2018) ...........................................................8

*American Beverage Ass'n v. Paxton*,
   2026 WL 395513 (W.D. Tex. Feb. 11, 2026) .......................................................27, 28

*Animal Legal Def. Fund Bos. v. Provimi Veal Corp.*,
   626 F. Supp. 278 (D. Mass. 1986) ...........................................................................23

*Armour & Co. v. Ball*,
   468 F.2d 76 (6th Cir. 1972) ......................................................................................23

*Arnona v. Smith*,
   749 So. 2d 63 (Miss. 1999) ......................................................................................35

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................7, 19, 31

*Austin v. Bayer Pharms. Corp.*,
   2013 WL 5406589 (S.D. Miss. Sept. 25, 2013) ........................................................33

*Becerra v. Coca-Cola Co.*,
   2018 WL 1070823 (N.D. Cal. Feb. 27, 2018) ...........................................................15

*Becerra v. Dr Pepper/Seven Up, Inc.*,
   2018 WL 3995832 (N.D. Cal. Aug. 21, 2018) ..........................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................2, 7, 8, 19, 20, 41

*Brassfield v. Wells Fargo Bank*,
   2023 WL 3046801 (S.D. Miss. Apr. 21, 2023) ........................................................8, 9

*Bristol-Myers Squibb Co. v. Superior Court*,
   582 U.S. 255 (2017) ................................................................................................44

*Brower v. Campbell Soup Co.*,
   243 F. Supp. 3d 1124 (S.D. Cal. 2017) ................................................................23, 24

*Bruner v. Anheuser-Busch, Inc.*,
   153 F. Supp. 2d 1358 (S.D. Fla. 2001) .....................................................................31

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
   29 F.4th 468 (9th Cir. 2022) ....................................................................................27

**TABLE OF AUTHORITIES–CONTINUED**

**Page(s)**

*Comer v. Murphy Oil*,
    839 F. Supp. 2d 849 (S.D. Miss. 2012)...................................................................12, 17, 18

*Conti 11. Container Schiffarts-GMBH & Co. KG M.S., MSC Flaminia v.*
    *MSC Mediterranean Shipping Co. S.A.*,
    91 F.4th 789 (5th Cir. 2024) .........................................................................................45

*Courson v. Cordis Corp.*,
    2018 WL 3058867 (N.D. Miss. June 20, 2018)..............................................................35

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)....................................................................................................4, 44

*Davenport v. HansaWorld USA, Inc.*,
    23 F. Supp. 3d 679 (S.D. Miss. 2014)........................................................................43, 45

*Deese v. Immunex Corp.*,
    2012 WL 463722 (S.D. Miss. Feb. 13, 2012)................................................................33

*Dickens v. A-1 Auto Parts & Repair, Inc.*,
    2018 WL 5726206 (S.D. Miss. Nov. 1, 2018)...........................................11, 12, 39, 40, 42

*Dickens v. A-1 Auto Parts & Repair, Inc.*,
    2018 WL 11393945 (S.D. Miss. Nov. 2, 2018)..............................................................45

*Dixieland Food Stores, Inc. v. Kelly's Big Star, Inc.*,
    391 So. 2d 633 (Miss. 1980)........................................................................................35

*Ducksworth v. Rook*,
    2015 WL 737574 (S.D. Miss. Feb. 20, 2015)..................................................................8

*Elliott v. El Paso Corp.*,
    181 So. 3d 263 (Miss. 2015)......................................................................................33, 34

*Elson v. Black*,
    56 F.4th 1002 (5th Cir. 2023) ......................................................................................36

*Fikes v. Wal-Mart Stores, Inc.*,
    813 F. Supp. 2d 815 (N.D. Miss. 2011).....................................................................39, 40

*Fozard v. Knauf Gips KG*,
    2024 WL 2158267 (S.D. Miss. May 13, 2024) ..........................................................34, 39

*Free Speech Coal., Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) ......................................................................................26, 27

*Gallagher Bassett Servs., Inc. v. Jeffcoat*,
    887 So. 2d 777 (Miss. 2004)......................................................................................11, 41

iv

**TABLE OF AUTHORITIES–C**ONTINUED

**Page(s)**

*Gardley-Starks v. Pfizer, Inc.*,
  917 F. Supp. 2d 597 (N.D. Miss. 2013)........................................................................11, 34

*Garrison v. Heublein, Inc.*,
  673 F.2d 189 (7th Cir. 1982) ........................................................................................31

*Gilmer v. McRae*,
  355 So. 3d 219 (Miss. 2022)..........................................................................................43

*Goode v. Baggett*,
  811 F. App'x 227 (5th Cir. 2020) ..................................................................................41

*Goode v. City of Southaven*,
  2019 WL 3082735 (N.D. Miss. May 1, 2019)...........................................................41, 43

*Goodnight Terminal Servs., Inc. v. ASG Chem. Holdings, LLC*,
  2026 WL 360915 (S.D. Miss. Feb. 9, 2026)....................................................................8

*Gorran v. Atkins Nutritionals, Inc.*,
  464 F. Supp. 2d 315 (S.D.N.Y. 2006).............................................................................30

*Green v. Specialized Loan Servicing, LLC*,
  2022 WL 704203 (N.D. Miss. Mar. 8, 2022) ................................................................38

*Green Hills Dev. Co., LLC v. Oppenheimer Funds, Inc.*,
  2020 WL 376659 (S.D. Miss. Jan. 23, 2020) ................................................................41

*Grocery Mfrs. of Am., Inc. v. Gerace*,
  755 F.2d 993 (2d Cir. 1985)...........................................................................................21

*Harris v. Brush Engineered Materials, Inc.*,
  2005 WL 3806048 (S.D. Miss. Feb. 18, 2005).....................................................35, 38, 39

*Hedrick v. BSH Home Appliances Corp.*,
  2025 WL 1238363 (C.D. Cal. Apr. 28, 2025) ...............................................................28

*In re Asbestos Sch. Litig.*,
  46 F.3d 1284 (3d Cir. 1994)............................................................................................42

*In re DePuy Orthopedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
  888 F.3d 753 (5th Cir. 2018) .........................................................................................39

*In re On-Site Fuel Serv., Inc.*,
  2020 WL 3712868 (Bankr. S.D. Miss. May 8, 2020)....................................................39

*Intent Performance LLC v. Intent Sports & Fitness, LLC*,
  2025 WL 1601045 (S.D. Miss. June 5, 2025) ...............................................................41

*Johansen v. Myers*,
  2023 WL 5498060 (S.D. Miss. Aug. 24, 2023)................................................................8

## TABLE OF AUTHORITIES–Continued

**Page(s)**

*Johnson v. theHuffingtonPost.com, Inc.*,
     21 F.4th 314 (5th Cir. 2021) ...........................................................................44

*Knight v. Kirby Inland Marine Inc.*,
     482 F.3d 347 (5th Cir. 2007) ..........................................................................15

*Kuenzig v. Hormel Foods Corp.*,
     505 F. App'x 937 (11th Cir. 2013) ..................................................................23

*Landrum v. Livingston Holdings, LLC*,
     396 So. 3d 1026 (Miss. 2024)..........................................................................39

*Lightheart v. Salvation Army*,
     2024 WL 4045473 (S.D. Miss. Sept. 4, 2024)..................................................10

*Luv N' Care, Ltd. v. Insta-Mix, Inc.*,
     438 F.3d 465 (5th Cir. 2006) ..........................................................................44

*M St. Invs., Inc. v. Zurich Am. Ins. Co.*,
     2014 WL 1326105 (S.D. Miss. Mar. 28, 2014) .......................................7, 35, 40

*Manuel v. Pepsi-Cola Co.*,
     2018 WL 2269247 (S.D.N.Y. May 17, 2018) ..............................................15, 16

*Martinez v. Kraft Heinz Co.*,
     2025 WL 2447793 (E.D. Pa. Aug. 25, 2025) ...........................1, 2, 9, 11-14, 18-20, 27, 33

*McGrath v. Bayer HealthCare Pharms. Inc.*,
     393 F. Supp. 3d 161 (E.D.N.Y. 2019) .............................................................16

*Meaunrit v. ConAgra Foods Inc.*,
     2010 WL 2867393 (N.D. Cal. July 20, 2010).................................................23

*Meyers v. Textron, Inc.*,
     540 F. App'x 408 (5th Cir. 2013) ...................................................................13

*Midwest Feeders, Inc. v. Bank of Franklin*,
     886 F.3d 507 (5th Cir. 2018) ..........................................................................41

*Mills v. Giant of Md., LLC*,
     441 F. Supp. 2d 104 (D.D.C. 2006)................................................................25

*Monsanto Co. v. Hall*,
     912 So. 2d 134 (Miss. 2005)...........................................................................12

*Moore ex rel. Moore v. Mississippi Valley Gas Co.*,
     863 So. 2d 43 (Miss. 2003)..............................................................................11

*Mullen v. Bell Helicopter Textron, Inc.*,
     144 F. Supp. 3d 884 (S.D. Miss. 2015)............................................................43

## TABLE OF AUTHORITIES–CONTINUED

**Page(s)**

*Mullen v. Bell Helicopter Textron, Inc.*,
2015 WL 11120331 (S.D. Miss. Aug. 17, 2015)...............................................................32

*MultiPlan, Inc. v. Holland*,
937 F.3d 487 (5th Cir. 2019) ...........................................................................................43

*National Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ....................................................................................26, 27

*National Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018).........................................................................................................28

*National Meat Ass'n v. Harris*,
565 U.S. 452 (2012).........................................................................................................21

*Nelson v. C.R. Bard, Inc.*,
553 F. Supp. 3d 343 (S.D. Miss. 2021).....................................................................29, 30

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964).........................................................................................................28

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013).............................................................................................28

*Otis v. Mississippi Sand Sols., LLC*,
2021 WL 6882335 (S.D. Miss. Jan. 26, 2021) ...............................................................40

*Pace v. Cirrus Design Corp.*,
93 F.4th 879 (5th Cir. 2024) ......................................................................................35, 36

*Pelman ex rel. Pelman v. McDonald's Corp.*,
396 F.3d 508 (2d Cir. 2005).............................................................................................19

*Pelman v. McDonald's Corp.*,
237 F. Supp. 2d 512 (S.D.N.Y. 2003)....................................................................19, 30, 31

*Phelps v. Hormel Foods Corp.*,
244 F. Supp. 3d 1312 (S.D. Fla. 2017) ...........................................................................23

*Pitts v. Ford Motor Co.*,
127 F. Supp. 3d 676 (S.D. Miss. 2015)............................................................................44

*Rex Distrib. Co. v. Anheuser-Busch, LLC*,
271 So. 3d 445 (Miss. 2019).............................................................................................43

*S.F. v. Archer-Daniels-Midland Co.*,
2014 WL 1600414 (W.D.N.Y. Apr. 21, 2014) ...........................................................18, 19

*Sellers v. Volkswagen AG, Volkswagen of Am., Inc.*,
2022 WL 4088185 (S.D. Miss. Sept. 6, 2022)................................................................45

**TABLE OF AUTHORITIES–CONTINUED**

**Page(s)**

*Slocum v. Allstate Ins. Co.*,
  2020 WL 428021 (S.D. Miss. Jan. 27, 2020) ...................................................8, 9

*Smith v. GE Healthcare Inc.*,
  2020 WL 1880787 (W.D. La. Mar. 31, 2020) ...................................................15

*Taylor v. S. Farm Bureau Cas. Co.*,
  954 So. 2d 1045 (Miss. Ct. App. 2007) ...........................................................38

*Terry v. N L Indus., Inc.*,
  2007 WL 1484742 (N.D. Miss. May 17, 2007)................................................37

*Thornton v. Tyson Foods, Inc.*,
  28 F.4th 1016 (10th Cir. 2022) ..................................................................21, 23

*Thornton v. Tyson Foods, Inc.*,
  482 F. Supp. 3d 1147 (D.N.M. 2020) ...............................................................23

*Turek v. General Mills, Inc.*,
  662 F.3d 423 (7th Cir. 2011) ............................................................................25

*United States v. Bryan Co.*,
  2012 WL 2051861 (S.D. Miss. June 6, 2012) ..................................................20

*Walker v. Smith*,
  2017 WL 946689 (S.D. Miss. Mar. 8, 2017) ....................................................41

*Webb v. Trader Joe's Co.*,
  2019 WL 5578225 (S.D. Cal. Oct. 29, 2019) ...................................................23

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
  792 F.3d 1313 (11th Cir. 2015) ........................................................................11

*Wesdem, L.L.C. v. Illinois Tool Works, Inc.*,
  70 F.4th 285 (5th Cir. 2023) ...............................................................................7

*Williams v. Bennett*,
  921 So. 2d 1269 (Miss. 2006)...........................................................................32

*Williams v. WMX Techs., Inc.*,
  112 F.3d 175 (5th Cir. 1997) ................................................................7, 35, 36

*Woods v. R.J. Reynolds Tobacco Co.*,
  635 F. Supp. 2d 530 (S.D. Miss. 2009)......................................................35, 38

*Yarbrough v. Hunt Southern Grp., LLC*,
  2019 WL 4392519 (S.D. Miss. Sept. 12, 2019)................................................15

*Young v. Bristol-Myers Squibb Co.*,
  2017 WL 706320 (N.D. Miss. Feb. 22, 2017) .......................................33, 34, 37

## TABLE OF AUTHORITIES–CONTINUED

**Page(s)**

**STATUTES**

21 U.S.C. § 343-1 ..................................................................................................24, 25

21 U.S.C. § 343-1(a) ...................................................................................................25

21 U.S.C. § 393(b)(1) ..................................................................................................24

21 U.S.C. § 451 ...........................................................................................................22

21 U.S.C. § 467 ...........................................................................................................24

21 U.S.C. § 467e ..........................................................................................................21

21 U.S.C. §§ 603-607 ..................................................................................................21

21 U.S.C. § 606(a) .......................................................................................................22

21 U.S.C. § 607(d) .......................................................................................................22

21 U.S.C. § 678 .....................................................................................................21, 24

Miss. Code Ann. § 11-1-63 ..........................................................................................39

Miss. Code Ann. § 11-1-63(a)(i)(2) .............................................................................29

Miss. Code Ann. § 11-1-63(a)(i)(3) .............................................................................32

Miss. Code Ann. § 11-1-63(a)(i)(4) .............................................................................34

Miss. Code Ann. § 11-1-63(a)(ii) .................................................................................29

Miss. Code Ann. § 11-1-63(a)(iii) ..........................................................................11, 29

Miss. Code Ann. § 11-1-63(e) ......................................................................................29

Miss. Code Ann. § 11-1-63(f)(ii) ............................................................................32, 33

Miss. Code Ann. § 97-23-3 ..........................................................................................35

N.Y. Gen. Bus. Law § 349 ...........................................................................................28

**CONSTITUTIONAL PROVISION**

U.S. Const. art. VI, cl. 2 ..............................................................................................20

**REGULATIONS**

9 C.F.R. pt. 317 ...........................................................................................................22

9 C.F.R. § 317.8(a) ......................................................................................................22

9 C.F.R. pt. 318 ...........................................................................................................22

9 C.F.R. pt. 319 ...........................................................................................................22

## TABLE OF AUTHORITIES–CONTINUED

**Page(s)**

9 C.F.R. pt. 381 ................................................................................................22

9 C.F.R. § 381.96 ............................................................................................23

9 C.F.R. pt. 412 ...............................................................................................22

9 C.F.R. § 412.1(a) ..........................................................................................22

9 C.F.R. §§ 412.1–412.2 .................................................................................23

9 C.F.R. pt. 424 ...............................................................................................22

9 C.F.R. § 424.21(a) ........................................................................................21

21 C.F.R. § 101.4(b)(14) .................................................................................25

21 C.F.R. § 101.22 ..........................................................................................25

21 C.F.R. § 131.200 ........................................................................................25

21 C.F.R. § 168.180 ........................................................................................25

21 C.F.R. § 184.1444 ......................................................................................26

21 C.F.R. § 184.1857 ......................................................................................26

21 C.F.R. § 184.1859 ......................................................................................26

**RULES**

Fed. R. Civ. P. 8 ............................................................2, 11, 25, 31, 35, 40

Fed. R. Civ. P. 8(a)(2) .......................................................................................8

Fed. R. Civ. P. 9(b) ..................................................................7, 35, 40, 42

Fed. R. Civ. P. 10(b) .........................................................................................8

Fed. R. Civ. P. 12(b)(2) ...................................................................................43

Fed. R. Civ. P. 12(b)(6) ...............................................................................7, 13

Fed. R. Evid. 201(b)(2) ...................................................................................23

**OTHER AUTHORITIES**

Centers for Disease Control & Prevention, *New Research Uncovers Concerning
    Increases in Youth Living with Diabetes in the U.S.* (Aug. 24, 2021) ..............................18

Zhangling Chen et al., *Ultra-Processed Food Consumption and Risk of Type 2
    Diabetes: Three Large Prospective U.S. Cohort Studies*,
    Diabetes Care (July 2023) ................................................................................17

x

**TABLE OF AUTHORITIES–C**ONTINUED

**Page(s)**

FSIS Directive 7120.1, *Safe and Suitable Ingredients Used in the Production
   of Meat, Poultry, and Egg Products* (USDA 2024)............................................................21

Sajjad Moradi et al., *Ultra Processed Food Consumption and Adult Diabetes Risk:
   A Systematic Review and Dose-Response Meta Analysis*,
   Nutrients (Dec. 2021)........................................................................................................17

Restatement (Second) of Torts § 402A.................................................................................30

Restatement (Second) of Torts § 876(b)................................................................................40

**INTRODUCTION**

Plaintiff Tamika Lawton alleges that her minor son, J.L., consumed so-called "ultra-processed foods"—an undefined yet purportedly all-encompassing range of fundamentally different foods and drinks—and developed pediatric type 2 diabetes. According to Plaintiff's own allegations, approximately 73% of the American food supply and 67% of the average child's diet falls within her definition of "UPF."[1] Yet Plaintiff has sued only eleven food and beverage manufacturers, asserting these companies are liable for her son's type 2 diabetes. The Complaint does not identify a single specific product that allegedly caused J.L.'s condition, does not allege how often or in what quantities J.L. consumed any product, and does not provide any factual allegations suggesting it was Defendants' foods and beverages that caused his pediatric type 2 diabetes rather than the multiple well-known causes, including genetics, lack of exercise, and obesity. In *Martinez v. Kraft Heinz Co.*, a federal court recently dismissed a lawsuit with virtually identical allegations brought by a different plaintiff against the same eleven Defendants, holding that it was an improper "shotgun pleading[]," did not identify the specific products the plaintiff consumed, and did not "plead more than the mere possibility of causation." 2025 WL 2447793, at *2-3 (E.D. Pa. Aug. 25, 2025). Plaintiff's Complaint fails for the same reasons, as well as several others.

*First*, the Complaint is the classic example of a shotgun pleading because it lacks sufficient allegations setting forth the basis for *each* Defendant's claimed liability. The overwhelming majority of the Complaint's more-than 848 paragraphs make undifferentiated allegations about "the UPF industry" or "each Defendant" collectively, without specifying which Defendant is

---

[1]    Defendants do not agree that the term "ultra-processed foods" or "UPF" reflects a valid method of categorizing foods and beverages (much less appropriately describes their products) and only use the term because Plaintiff does so throughout her Complaint.

responsible for which conduct, product, or statement. This formulation appears more than 165 times, and leaves Defendants without any way to know what specific conduct Plaintiff alleges gave rise to each Defendant's purported liability. The *Martinez* court dismissed a similarly vague complaint based on this shortcoming; as it explained, allowing the case "to proceed to discovery would run contrary to Rule 8's basic pleading requirements and work an undue burden on Defendants." 2025 WL 2447793, at *3.

*Second*, Plaintiff fails to plead causation, which is an element of every alleged claim. The Complaint does not identify the specific foods and beverages J.L. allegedly consumed, instead listing brand names encompassing hundreds of distinct products with different ingredients and manufacturing processes; does not plausibly allege that any Defendant's product is capable of causing pediatric type 2 diabetes (general causation); and does not plausibly allege that any Defendant's product actually caused J.L.'s condition (specific causation). The studies Plaintiff cites purport to show, at most, a correlation between "UPF" consumption and type 2 diabetes in adults, which is not causation. Thus, the notion that J.L.'s alleged periodic consumption of certain of Defendants' products—whatever they may be—somehow led him to develop type 2 diabetes before the age of ten is pure speculation. These flaws were an additional reason the court dismissed the complaint in *Martinez*: As that court put it, "[b]asic pleading rules require Plaintiff to plead more than the mere possibility of causation." 2025 WL 2447793, at *2 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).[2]

*Third*, Plaintiff's claims are substantially preempted by federal law. Congress enacted comprehensive legislation, implemented by the U.S. Department of Agriculture ("USDA"), that

---

[2]   Although Plaintiff seems to attempt to address *Martinez* by adding brand-level consumption allegations, she still fails to identify specific product formulations, quantities, timing or any causal mechanism linking any Defendant's product to J.L.'s alleged injury.

regulates every aspect of foods containing meat or poultry, including inspection, manufacturing, processing, and labeling. Similarly, Congress vested the Food and Drug Administration ("FDA") with comprehensive regulatory authority over ingredients and labeling of food other than meat and poultry. Although Plaintiff's vague allegations do not specify what Defendants should have done differently with respect to labeling or manufacturing (effectively undermining Defendants' ability to conduct a complete preemption analysis), Plaintiff's claims are necessarily barred to the extent she is attempting to impose different (or even additional) health, labeling, or ingredient requirements than what is mandated by the USDA or FDA.

*Fourth*, Plaintiff's attempt to mandate "UPF" warnings through litigation runs afoul of the First Amendment's protections against compelled commercial speech on matters over which there is no scientific consensus. Any judgment that would force Defendants to take one side of a scientific debate—or punish them for not doing so in the past—would violate Defendants' First-Amendment rights under well-established law.

*Fifth*, each of Plaintiff's claims fails for a variety of other claim-specific reasons. Count I (failure to warn/product liability) cannot proceed because: (i) Defendants did not have a duty to warn of the commonsense risks inherent in choosing what foods and how much of them to eat; and (ii) even if they did, the Complaint does not plausibly allege that J.L. or the person responsible for buying his food would have heeded any such warning. Count II (design defect/product liability) fails because Plaintiff's claim that Defendants should have designed food that is *not* "ultra-processed" is an improper demand that they manufacture *entirely different* products. Counts III through V raise fraud-based claims that should be dismissed because Plaintiff does not sufficiently plead the misrepresentation and reliance elements under any standard, let alone with the particularity required for fraud-based claims. And finally, Counts VI-VII assert conspiracy claims

3

against six of the eleven Defendants—The Kraft Heinz Company ("Kraft Heinz"); Mondelēz International, Inc. ("Mondelēz International"), Post Holdings, Inc. ("Post Holdings"), The Coca-Cola Company ("Coca-Cola"), General Mills, Inc. ("General Mills"), and Mars, Inc. ("Mars")—without plausibly pleading that these Defendants entered into any agreement to act unlawfully.

*Finally*, the Court should independently dismiss all claims against Mondelēz International and Post Holdings because they are not subject to personal jurisdiction in Mississippi. Both Defendants are mere holding companies that do not transact any business in Mississippi and did not manufacture, design, or sell any of the products or brands identified in the Complaint. They are not subject to general jurisdiction in this Court because they are not incorporated in this state and do not have their principal places of business here. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). Nor are these Defendants subject to specific jurisdiction because they did not play any role in the products or brands that allegedly caused J.L.'s alleged injury—i.e., they have no Mississippi-based contacts that "give rise to the liabilities [being] sued on." *Id.* at 138 (citation omitted).[3]

For these reasons, discussed further below, the Court should dismiss the Complaint in full.

## BACKGROUND

Defendants are eleven prominent food and beverage manufacturers: Kraft Heinz, Mondelēz,[4] Post, Coca-Cola, PepsiCo, Inc. ("PepsiCo"), General Mills, Nestlé USA, Inc. ("Nestlé USA"), Kellanova, WK Kellogg Co. ("WK Kellogg"), Mars, and Conagra Brands, Inc. ("Conagra"). Many trace their origins to the nineteenth century and have fed generations of

---

[3]    Mondelēz International and Post Holdings only join the remainder of this motion in the alternative and without any waiver of their challenges to personal jurisdiction.

[4]    Mondelēz International is not a manufacturer, as set forth above and in Section VI, below. Its subsidiary, Mondelēz Global LLC ("Mondelez"), is a manufacturer of food products.

Americans. They produce an enormous array of staple foods and beverages, including cereal, pastas, salsa, rice, beans, sports drinks, yogurt, chocolate, juices, stuffing, canned fruits, soups, baking and cake mixes, sandwiches, popcorn, and more. Many of these products are heavily regulated by the USDA and undergo processing that complies with FDA regulations, which, among other benefits, eliminates harmful bacteria, extends shelf life, and lowers prices for consumers.

Plaintiff alleges that "ultra-processed foods" constitute "one of the greatest threats to health" and that Defendants' diverse foods and beverages fit within that nebulous category. Compl. ¶¶ 4-5. Plaintiff's Complaint proposes a broad and shifting definition of what constitutes "UPF," and alleges that it encompasses "[c]urrently about 73% of the food in our food supply" and "67% of children's diets on average." *Id.* ¶ 356; *see* ¶¶ 105-115 (defining "UPFs" variously as foods that are "different than . . . traditional diets" or which may contain any of a non-exhaustive list of "industrial processes," "fractionated substances," "chemical modifications," "additives," "disguise[d] unpleasant sensory properties," packaging, "ingredients contain[ing] substances that are never or rarely used in kitchens," or which are "hyper-palatable," or which use "aggressive" marketing).

Plaintiff does not identify which of Defendants' foods and beverages J.L. allegedly consumed, offering instead a list of 36 ***brand*** names that comprise hundreds of different foods and beverages with different ingredients and manufacturing processes. *See, e.g.*, Compl. ¶¶ 605, 615, 625, 635, 645, 655, 665, 675, 685, 695. As to each of these brands, the Complaint alleges that, beginning when he was a toddler and before his pediatric type 2 diabetes diagnosis at age nine, J.L. consumed Defendants' products as rarely as twice a year or, at most, multiple times a week. *See, e.g.*, *id.* ¶¶ 605, 615, 635. Yet the Complaint makes no effort to distinguish among these

products or the ingredients they contain, instead treating each as equally responsible for J.L.'s diagnosis regardless of how infrequently or in what quantity it was allegedly consumed. Nor does it provide any information about his diet more generally—including what other "UPF" (or non-"UPF") foods and beverages he allegedly consumed that are made by other manufacturers, restaurants, and food providers. Indeed, while Plaintiff claims that 73% of the American food supply and 67% of children's diets are "UPF," the Complaint names only these eleven manufacturers and does not allege that their products constitute J.L.'s entire diet, or even the majority of it.

Plaintiff seeks to hold *only* the eleven Defendants—manufacturers of a subset of her child's diet—responsible for her child's development of pediatric type 2 diabetes, even as the Complaint acknowledges that the disease can be caused by other factors that have nothing to do with "UPF," such as "a lack of exercise, genetics, non-UPF, or any combination thereof." Compl. ¶ 380; *see also id.* ¶ 375 (noting that "obesity is a possible marker of type 2 diabetes in children, but is not the sole cause"). Plaintiff does not address J.L.'s physical activity, genetics, or family history, or otherwise plead any facts suggesting that J.L. would not have developed this condition but for his consumption of so-called "UPF" from each of these eleven Defendants.

Plaintiff's "marketing"-related allegations are similarly sparse and generic. The Complaint references a handful of advertisements from select Defendants. *See* Compl. ¶¶ 325-348. It does not allege that J.L. or those responsible for purchasing his food saw any of these advertisements, when they saw them, or what purchases (if any) they induced. Several of the referenced advertisements are for products J.L. does not claim to have consumed, and many aired after his 2019 diagnosis. *Compare id.* ¶¶ 325-348, *with id.* ¶¶ 605-695.

Overall, large portions of the Complaint appear to be copied from the complaint that the court dismissed in *Martinez*, including improper allegations and images unrelated to Defendants, such as animal studies not tied to any Defendant's products and a purported "Mars" ad that appears to be a fan-made YouTube video. *See* Compl. ¶¶ 166, 348.[5]

Based on these copied allegations, Plaintiff asserts claims against all Defendants for failure to warn (Count I); defective design (Count II); negligent misrepresentation (Count III); fraud/fraudulent concealment (Count IV); and deceptive advertising (Count V). Additionally, Plaintiff asserts claims for civil conspiracy (Count VI) and aiding and abetting/concerted action (Count VII) against Kraft Heinz, Mondelēz International, Post, General Mills, Coca-Cola, and Mars.

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When a plaintiff has not pled facts sufficient to "nudge[] [his] claims across the line from conceivable to plausible," his "complaint must be dismissed." *Twombly*, 550 U.S. at 570. A claim deemed implausible, based on a court's "judicial experience and common sense," should be dismissed. *Wesdem, L.L.C. v. Illinois Tool Works, Inc.*, 70 F.4th 285, 292 (5th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 679). Additionally, "[t]he Fifth Circuit strictly construes Rule 9(b) and requires a plaintiff pleading fraud 'to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *M St. Invs., Inc. v. Zurich Am. Ins. Co.*, 2014

---

[5]     The Complaint appears to include a screenshot of a fan-made video featuring Pac-Man. *See* https://www.youtube.com/watch?v=NWBa-Ba_Rsk.

WL 1326105, at *3 (S.D. Miss. Mar. 28, 2014) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).

## ARGUMENT

### I.    THE COMPLAINT IS AN IMPERMISSIBLE SHOTGUN PLEADING.

As a threshold matter, the Complaint should be dismissed because it is a classic shotgun pleading. Rule 8(a)(2) demands "a short and plain statement" showing entitlement to relief, and Rule 10(b) requires individual claims to be stated in separate counts. These rules ensure that a defendant has "fair notice" of the claims asserted against it. *Twombly*, 550 U.S. at 555 (citation omitted). A complaint violates these rules where it "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions," or where "each count adopts the allegations of all preceding counts." *Alexander v. Global Tel Link Corp.*, 2018 WL 3469180, at *4 (S.D. Miss. July 18, 2018) (Guirola, J.) (internal quotation marks and citation omitted).

"[S]hotgun pleadings" "delay cases by wasting scarce judicial and parajudicial resources," *Johansen v. Myers*, 2023 WL 5498060, at *4 (S.D. Miss. Aug. 24, 2023), and inevitably lead to a "discovery goat rodeo," *Ducksworth v. Rook*, 2015 WL 737574, at *7 (S.D. Miss. Feb. 20, 2015) (citation omitted). Accordingly, this Court and others in this District have not hesitated to dismiss such pleadings. *See, e.g.*, *Johansen*, 2023 WL 5498060, at *4 ("[T]he Court is unable to assess the how, what or when, as it pertains to each individual Defendant and each separate cause of action."); *Goodnight Terminal Servs., Inc. v. ASG Chem. Holdings, LLC*, 2026 WL 360915, at *5 (S.D. Miss. Feb. 9, 2026) (*sua sponte* raising issue of shotgun pleading to dismiss claims where pleading made

8

"it difficult to determine which facts are relevant to which claims").[6] The Court should likewise dismiss Plaintiff's Complaint, for several reasons.

For starters, Plaintiff does not identify the specific bases for each Defendant's supposed liability. Despite acknowledging that Defendants are distinct companies that design, manufacture, and market disparate products, *see, e.g.*, Compl. ¶¶ 46-104, the individual counts simply "lump[] all Defendants together and make[] no differentiation between Defendants as to any action taken," *Slocum*, 2020 WL 428021, at *6. The Complaint alleges generically that "each Defendant" failed "to adequately warn about their defective UPF," Compl. ¶ 709; that the foods and beverages of "each Defendant" were "unsafe, defective, and unreasonably dangerous," *id.* ¶ 722; and that "each Defendant" "failed to exercise ordinary care in their representations" regarding their foods and beverages, *id.* ¶ 742. The Complaint's use of brands, instead of products, further exacerbates the notice deficiencies. *See infra* pp. 12-14; *Martinez*, 2025 WL 2447793, at *3. None of these allegations identifies what specific products (as opposed to brands) are at issue, what ingredient or characteristic renders each product defective, or what statement is at issue for any individual Defendant.

Merely repeating a list of Defendants' names after generic allegations does not supply that critical information. *See, e.g.*, Compl. ¶¶ 705-720 (using the "each Defendant" formulation 18 times in Count One); *id.* ¶¶ 722-735 (14 times in Count Two). The following sentence structure appears more than *165 times* throughout the Complaint:

---

[6]    *See also Slocum v. Allstate Ins. Co.*, 2020 WL 428021, at *6 (S.D. Miss. Jan. 27, 2020) (complaint improperly "lump[ed] all Defendants together"); *Brassfield v. Wells Fargo Bank*, 2023 WL 3046801, at *4 (S.D. Miss. Apr. 21, 2023) (dismissing complaint in part for failing to explain "specific claims against each Defendant").

9

391.    Indeed, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS and CONAGRA – had actual knowledge that these consequences would occur.

At other points, the Complaint repeats nearly identical allegations ten times, changing only the Defendant's name, *see, e.g.*, *id.* ¶¶ 196-205, 415-434. Reeling out ten company names alongside boilerplate allegations provides no Defendant-specific notice and is classic shotgun pleading.

As the starkest example of this problem, the Complaint improperly lumps together Kellanova and WK Kellogg and defines them collectively as "Kellogg's." *Id.* ¶ 94. Kellanova and WK Kellogg are two distinct companies that manufacture different products. Yet apart from the case caption, the list of Defendants, and allegations regarding Kellanova's and WK Kellogg's prior relationship to the Kellogg Company, the Complaint does not assert any substantive allegations against Kellanova or WK Kellogg, independently, at all. *See, e.g.*, *id.* ¶¶ 84-88, 94. The Complaint thus names two Defendants in the caption without ever specifying what each is alleged to have done—the very definition of inadequate notice.

The Complaint's marketing allegations are equally generic. Even when the Complaint provides examples of particular marketing materials, *see id.* ¶¶ 325-348, or identifies the brands of products that Plaintiff allegedly consumed, *see, e.g.*, *id.* ¶¶ 604-703, it immediately returns to boilerplate allegations against Defendants "collectively," *see, e.g.*, *id.* ¶ 350 ("Each Defendant . . . collectively target[s] kids . . . ."); *id.* ¶ 351 (similar); *id.* ¶ 352 ("some UPF companies claim that they restrict their child targeting to adolescents"); *id.* ¶ 353 (criticizing the marketing of "UPF companies"); *id.* ¶ 354 ("Each Defendant . . . engage[d] in unfair and deceptive marketing . . . ."). The Complaint's pervasive use of group pleading is not salvaged by the inclusion of a few specific examples across its 174 total pages and reincorporation in each count. *See, e.g.*, *Lightheart v. Salvation Army*, 2024 WL 4045473, at *4 (S.D. Miss. Sept. 4, 2024) (plaintiff improperly "pleads

10

counts against groups of defendants, incorporating by reference all the hundreds of preceding facts from the introductory sections, depriv[ing] the parties and this Court of adequate notice of her claims"); *Martinez*, 2025 WL 2447793, at \*3 (citing *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015)).

These pleading defects confirm that dismissal is warranted here. The *Martinez* court reasoned that the "complaint implicates thousands of unidentified products and discusses the eleven Defendants as a group without specifying each Defendant's wrongful behavior." 2025 WL 2447793, at \*3. There, as here, the "overwhelming majority of the 668 paragraphs discuss[ed] Defendants generally." *Id.* (citation omitted). Because such a "shotgun approach makes it impossible for each Defendant to determine what conduct, design, promotion, sale, or product Plaintiff is referring to," the court concluded that "[a]llowing th[e] case to proceed to discovery would run contrary to Rule 8's basic pleading requirements and work an undue burden on Defendants." *Id.* The same result is warranted here for Plaintiff's cut-and-pasted allegations.

## II.    ALL OF PLAINTIFF'S CLAIMS FAIL FOR LACK OF CAUSATION.

Under the Mississippi Product Liability Act ("MPLA"), a plaintiff must prove that a purported defect "proximately caused the damages for which recovery is sought." Miss. Code Ann. § 11-1-63(a)(iii). Thus, in any Mississippi products-liability action, "it is incumbent upon the plaintiff . . . to show that the defendant's product was the cause of the plaintiff's injuries." *Moore ex rel. Moore v. Mississippi Valley Gas Co.*, 863 So. 2d 43, 46 (Miss. 2003); *see Dickens v. A-1 Auto Parts & Repair, Inc.*, 2018 WL 5726206, at \*1 (S.D. Miss. Nov. 1, 2018) (Guirola, J.). Plaintiff's other claims similarly require her to plead and prove causation. *See Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786-787 (Miss. 2004) (conspiracy claim requires causation); *Gardley-Starks v. Pfizer, Inc.*, 917 F. Supp. 2d 597, 603 (N.D. Miss. 2013) (fraud-based claims require causation). Mississippi's proximate cause standard is "stringent" and requires

11

a plaintiff to plausibly plead both that: (1) "his injury would not have occurred *but for* the defendant's negligence" (cause in fact); and (2) the injury is a "reasonably foreseeable" consequence of that conduct (legal cause). *Comer v. Murphy Oil*, 839 F. Supp. 2d 849, 867 (S.D. Miss. 2012) (Guirola, J.) (emphasis added).

As this Court has recognized, "the parties should not be permitted to engage in discovery that will likely cost millions of dollars, when the tenuous nature of the causation alleged is readily apparent at the pleadings stage of the litigation." *Id.* at 862. That is exactly the case here: Plaintiff neither satisfies the requirement of product identification nor sufficiently pleads either general or specific causation. Those defects foreclose *all* of Plaintiff's claims.

### A.  Plaintiff Fails To Adequately Identify The Products At Issue In This Case.

Plaintiff's Complaint fails to state a claim because it does not even identify the specific product or products at issue, let alone the specific alleged defect in any product. A threshold component of causation is "product identification"—i.e., "exposure to a specific defendant's product[.]" *Dickens*, 2018 WL 5726206, at *1. In *Dickens*, this Court rejected a plaintiff's attempt to circumvent this threshold requirement at the pleading stage by joining a number of product manufacturers alleged to have caused an individual's injury and contending that each should be held jointly and severally liable under novel enterprise, market-share, and alternative liability theories. *Id.* at *1-2; *see also Monsanto Co. v. Hall*, 912 So. 2d 134, 137-138 (Miss. 2005) (a plaintiff must "show product identification of the defendants' actual products, exposure of the plaintiffs to those products, and proximate causation as to the injuries suffered by the plaintiffs").

A plaintiff does not satisfy the product identification component of causation by simply setting forth various "brands manufactured or sold by the Defendants" without "identif[ying] specific *products* he consumed within these brands." *Martinez*, 2025 WL 2447793, at *3. In *Martinez*, the plaintiff "list[ed] over 100 brands manufactured" by the same eleven Defendants

12

here, "put[ting] thousands of products at issue without any additional information to identify which caused his harm." *Id.* In dismissing the complaint, the court highlighted as one example that the Old El Paso brand "includes at least 111 different products, ranging from refried beans to corn and flour tortillas." *Id.*[7] As the court explained, "[e]ach product has different ingredients and manufacturing processes, and it is unclear which product(s) Plaintiff consumed." *Id.* Without identifying specific products, the *Martinez* court recognized that a plaintiff "cannot allege a causal connection between conduct of the defendants and [p]laintiff's injuries." *Id.* (citation omitted).

Each of the brands named in this Complaint consists of many products with "different ingredients and manufacturing processes." *Martinez*, 2025 WL 2447793, at *3; *see* Compl. ¶¶ 605, 615, 625, 635, 645, 655, 665, 675, 685, 695. In addition to referencing the Old El Paso brand like the *Martinez* plaintiff, Compl. ¶ 655, the Complaint here also identifies Betty Crocker, *id.*—a brand covering everything from a range of desserts (including certain low-sugar versions) to pasta salad, scalloped potato mix, au gratin potatoes, and instant mashed potatoes.[8] The Hot Pockets brand named in the Complaint (¶ 665) is similarly diverse, encompassing approximately 20 different types of sandwiches, ranging from several pizza products to multiple breakfast versions and high-protein meat options.[9] The Chef Boyardee brand (¶ 685) includes a range of pasta and pizza products and frozen meals.[10] And the Complaint takes the same undifferentiated approach

---

[7]     As part of its reasoning, the *Martinez* court took judicial notice of the Old El Paso website, finding it "integral to Plaintiff's claims." *Id.* at *12 n.2 (citing https://www.oldelpaso.com/products#first=60).

[8]     *See* https://www.bettycrocker.com. This Court should take judicial notice of the publicly accessible websites of the challenged brands because the authenticity of the information cannot seriously be questioned, and it is critical to resolving the threshold requirement of product identification. *See Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) ("[A] district court may take into account documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned.") (affirming trial court's Rule 12(b)(6) dismissal).

[9]     *See* https://www.goodnes.com/hot-pockets/products/all.

[10]     *See* https://chefboyardee.com.

to every other brand too.[11] Plaintiff's failure to identify the specific product(s) at issue is dispositive: Without pleading that threshold information, there can be no plausible inference of causation, and the alleged defect—whether an ingredient, formulation, or manufacturing process— remains entirely speculative.

The Complaint's attempt at defining "UPF" is of no help because it generically lists 28 different *categories* of ingredients and additives that Plaintiff alleges are used in "UPF" products, *id.* ¶ 109 (listing, *e.g.*, "colors, flavors, flavor enhancers," etc.), as well as multiple different types of processing that "UPF" products can undergo, *id.* ¶ 111. But Plaintiff never alleges which of those ingredients, additives, or processes are used in the products allegedly consumed by J.L., let alone which ingredients or processes Plaintiff believes caused J.L. to develop pediatric type 2 diabetes. Instead, Plaintiff treats all "UPF," including some unspecified subset of Defendants' products, as fungible; she assumes that J.L.'s consumption of such foods caused his condition, without identifying any particular product or explaining why those products, as opposed to countless others in the marketplace, were responsible. Moreover, because the list of potential ingredients, additives, and processing methods purports to be non-exhaustive, it is impossible to identify the foods and beverages at issue within Defendants' brands. That imprecision is only exacerbated by Plaintiff's contention that 73% of the nation's food supply qualifies as "UPF." Plaintiff's attempt to put a wide range of different "products at issue without any additional information to identify which caused [J.L.'s] harm," *Martinez*, 2025 WL 2447793, at *3, is a failure to plead causation.

---

[11]    Capri Sun (¶ 605) includes approximately 36 different drinks. *See* https://www.capri-sun.com/en/products/core. There are 30 different products in the Oreo Cookies brand (¶ 615). *See* https://www.oreo.com/collections/classics. Minute Maid (¶ 635) includes three distinct orange juices, 12 different lemonades and fruit drinks, six zero sugar juices, eight variety juices, four juice boxes, and eight frozen juices. *See* https://www.coca-cola.com/us/en/brands/minute-maid. Lays (¶ 645) includes many types and flavors of chips. *See* https://www.lays.com/product-category/lays. Defendants could go on and on.

### B. Plaintiff Does Not Plausibly Allege Either General Or Specific Causation.

Even if Plaintiff had sufficiently identified which products J.L. consumed, the Complaint does not plausibly allege that any Defendant's product *can* cause, much less that the amount of any product J.L. consumed *did* cause his pediatric type 2 diabetes. To establish causation, a plaintiff must establish both general causation (whether a substance is capable of causing the injury in the general population) and specific causation (whether it caused this plaintiff's injury). *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007); *see Yarbrough v. Hunt Southern Grp., LLC*, 2019 WL 4392519, at *2 (S.D. Miss. Sept. 12, 2019) (Guirola, J.). The Complaint does not plausibly plead either requirement.

*1. General Causation.* The studies Plaintiff cites in the Complaint do not support a plausible theory that any Defendant's product actually causes pediatric type 2 diabetes—the condition at issue in this lawsuit. Where a plaintiff purports to rely on literature to plead general causation, a court should not blindly credit every conclusion a plaintiff asks it to draw from those studies. *See Smith v. GE Healthcare Inc.*, 2020 WL 1880787, at *6 (W.D. La. Mar. 31, 2020) (recommending dismissal at the pleading stage because the complaint "does not refer to a single study that has suggested a causal relationship between [the product] and adverse health effects in patients with normal renal function"), *report and recommendation adopted*, 2020 WL 1875644 (W.D. La. Apr. 15, 2020); *see also Becerra v. Coca-Cola Co.*, 2018 WL 1070823, at *4 (N.D. Cal. Feb. 27, 2018).

Rather, a court should ask whether the plaintiff "has overstated the actual science set forth in the citations," *Coca-Cola Co.*, 2018 WL 1070823, at *4—that is, whether the studies "point only to a non-causal association," bearing in mind that "[i]n law, as in science, '[c]orrelation is not causation,'" *Manuel v. Pepsi-Cola Co.*, 2018 WL 2269247, at *10-12 (S.D.N.Y. May 17, 2018), *aff'd*, 763 F. App'x 108 (2d Cir. 2019); *see also, e.g.*, *Becerra v. Dr Pepper/Seven Up, Inc.*, 2018

15

WL 3995832, at *9 (N.D. Cal. Aug. 21, 2018) (plaintiff's "cites do not cross the threshold from allegations of correlation to causation"), *aff'd*, 945 F.3d 1225 (9th Cir. 2019); *McGrath v. Bayer HealthCare Pharms. Inc.*, 393 F. Supp. 3d 161, 166, 171-172 (E.D.N.Y. 2019) (refusing to credit complaint's "allegations regarding the causal association between [the product, biological processing,] and a significant adverse reaction" where those allegations were "conclusory and grounded in hypothesis rather than scientific evidence").

In *Manuel*, for example, the plaintiffs asserted consumer-fraud claims, alleging that the use of the word "diet" in Diet Pepsi was deceptive because the artificial sweeteners in Diet Pepsi allegedly impeded weight loss and actually led to weight gain. 2018 WL 2269247, at *9. While the complaint cited multiple studies, those studies merely suggested a ***correlation*** between Diet Pepsi and weight gain and, thus, "d[id] no more than queue up for analysis by future researchers the issue whether there is a causal relationship between [artificial sweetener] consumption and weight gain." *Id.* Because "[p]laintiffs' claims ha[d] outrun the science," the court concluded that the complaint had failed to plead a plausible theory of causation and dismissed the lawsuit. *Id.* at *12. The Second Circuit affirmed, reasoning that "[n]one of the studies purports to establish a causal relationship between non-nutritive sweeteners and weight gain to a degree that is sufficiently strong," and that as a result, "[p]laintiffs cannot raise a plausible inference that the use of the word 'diet' is false, inaccurate, or misleading." *Manuel v. Pepsi-Cola Co.*, 763 F. App'x 108, 109 (2d Cir. 2019) (summary order).

Plaintiff's claims here likewise "outrun the science." *Manuel*, 2018 WL 2269247, at *10. Although the Complaint cites a handful of studies that purportedly suggest that "UPF" generally pose health concerns, none concludes that there is a ***causal*** relationship between any Defendant's specific product and pediatric type 2 diabetes. Rather, as Plaintiff expressly acknowledges, those

16

studies, at most, suggest that there is an "association" (i.e., correlation) between "UPF in diets" (whatever that amorphous term means) and type 2 diabetes in adults. Compl. ¶ 33.[12] In other words, the Complaint fails to plausibly plead that "UPF" (much less any of Defendants' specific products) are even capable of *causing* pediatric type 2 diabetes.

Compounding this failure, the Complaint lists various characteristics that purportedly render a food "ultra-processed," but never identifies which of those characteristics is allegedly harmful, why it is harmful, or how it could plausibly cause pediatric type 2 diabetes. *See, e.g.*, ¶¶ 109-113 (listing examples of ingredients, additives, and industrial processes purportedly used in "ultra-processed foods"); ¶¶ 116-120 (asserting "UPF" are harmful because of "ultra-processing" itself, not any identified characteristic); ¶¶ 245-246 (invoking generalized biological mechanisms without tying them to a specific ingredient, process, or attribute). Absent any allegation tying a specific ingredient, process, or attribute of "UPF" to the claimed injury, Plaintiff cannot establish that any of Defendants' foods or beverages, or their components, actually cause pediatric type 2 diabetes.

*2. Specific Causation.* The Complaint also fails to allege that Defendants' products were the but-for cause of *J.L.'s* condition. Plaintiff is required to plead facts capable of "demonstrat[ing] that [J.L.'s] injury would not have occurred *but for* the defendant's" alleged conduct. *Comer*, 839 F. Supp. 2d at 867 (emphasis added). But Plaintiff fails to do so. She acknowledges that pediatric

---

[12]    Even a cursory review of the cited (and judicially noticeable) studies demonstrates that they fall well short of reaching any conclusion that "UPF" in general causes type 2 diabetes, much less in children, with one even reporting that "some UPF subgroups were associated with *lower* risk . . . ." Zhangling Chen et al., *Ultra-Processed Food Consumption and Risk of Type 2 Diabetes: Three Large Prospective U.S. Cohort Studies*, Diabetes Care (July 2023) (cited in n.42 of Compl.) (emphasis added). And one study found that "a meta-analysis" (i.e., synthesis of existing data) on the proposed association between "UPF" intake and risk of type 2 diabetes in adults was not even "possible" "due to a limited number of studies." Sajjad Moradi et al., *Ultra Processed Food Consumption and Adult Diabetes Risk: A Systematic Review and Dose-Response Meta Analysis*, Nutrients (Dec. 2021) (cited in n.42 of Compl.).

type 2 diabetes can be caused by "a lack of exercise, genetics, non-UPF, or any combination thereof." Compl. ¶ 380. And she cites an article discussing what "type 2 diabetes could be caused by" that never mentions "UPF." Centers for Disease Control & Prevention, *New Research Uncovers Concerning Increases in Youth Living with Diabetes in the U.S.* (Aug. 24, 2021) (cited at Compl. ¶ 374). Although Plaintiff insists that "[c]hildhood type 2 diabetes cannot be caused *solely* by" those factors alone or in combination, Compl. ¶ 380 (emphasis added), she fails to allege that J.L. lacked these risk factors or that he would have developed pediatric type 2 diabetes even in their absence. That is not but-for causation. *See Comer*, 839 F. Supp. 2d at 867.

The Complaint is also devoid of the basic factual details necessary to plausibly connect J.L.'s consumption of Defendants' products to his diagnosis. Plaintiff does not allege in what quantities J.L. consumed any particular product, when he began experiencing symptoms, or any meaningful temporal relationship between his consumption and his diagnosis. *See Martinez*, 2025 WL 2447793, at *2. Some brands were allegedly consumed as rarely as twice per year (¶ 645),[13] yet the Complaint makes no effort to distinguish among products, treating each as equally responsible regardless of how infrequently it was consumed. And there are no facts about J.L.'s overall diet, physical activity, genetics, or family medical history that would permit an inference that Defendants' products, rather than any number of other factors, caused his condition. *See S.F. v. Archer-Daniels-Midland Co.*, 2014 WL 1600414, at *4 (W.D.N.Y. Apr. 21, 2014) (dismissing

---

[13]    While Defendants accept the well-pleaded facts as true for purposes of this Motion, the Court should note that the Complaint's consumption allegations are facially implausible. The Complaint alleges that J.L. consumed products from 36 different brands from 10 different manufacturers at specified frequencies beginning as early as age two. Compl. ¶¶ 605-695. Every one of those frequencies is alleged as a single, static rate that never changes across the entire exposure period, in some cases spanning 15 years. *Id.* For example, the Complaint would have J.L. consuming Gatorade (three times per week), Pop Tarts (three times per week), and microwave popcorn (three times per month) at precisely the same rate at age two as at age seventeen. *Id.* ¶¶ 645, 675, 685. This static-consumption model is implausible and should not be credited. *See Twombly*, 550 U.S. at 570.

claim that products containing high-fructose corn syrup caused type 2 diabetes because "aside from idly listing various common foods she has eaten," plaintiff did not plead facts plausibly alleging causation), *aff'd*, 594 F. App'x 11 (2d Cir. 2014); *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 538 (S.D.N.Y. 2003) (dismissing claim that McDonald's food caused obesity and diabetes because "[n]o reasonable person could find [proximate] cause based on the facts in the Complaint without resorting to 'wild speculation'").[14]

As in *Martinez*, this fundamental pleading defect warrants dismissal of the Complaint. The *Martinez* court held that the plaintiff's complaint there did not "plead more than the mere possibility of causation" because he did not "allege how often he consumed Defendants' products, in what amounts, or when." *Martinez*, 2025 WL 2447793, at *2 (citing *Twombly*, 550 U.S. at 557). "Neither [did] he allege when he ate Defendants' products in relation to when he received his diagnoses or even began experiencing symptoms." *Id.* And the paucity of these basic details was compounded by "the reality that these diseases have a multitude of causes." *Id.* Like Plaintiff here, Martinez also "idly list[ed] various common brands he ha[d] eaten" and criticized the "science behind the production and marketing of UPFs" at a high level. *Id.* (citation and alterations omitted). That is not sufficient. As the *Martinez* court reasoned, Plaintiff's laundry list of brands is devoid of any facts capable of "show[ing] that it was [J.L.'s] consumption of *these* [brands] . . . that led to [his] disease." *Id.* (emphasis added) (citation omitted). Further, like *Martinez*, the Complaint here similarly fails to allege any temporal connection between this consumption and when J.L. "began experiencing symptoms" of type 2 diabetes. *Id.* And there are no facts suggesting that it

---

[14] Although the Second Circuit reversed the dismissal of an amended version of the *Pelman* complaint, it relied on pre-*Twombly*/*Iqbal* pleading standards. *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511-512 (2d Cir. 2005). The Supreme Court has since clarified that "only a complaint that states a plausible claim for relief" can "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678-679. The "continuing viability" of the Second Circuit's decision "is open to question." *S.F.*, 2014 WL 1600414, at *4.

was "UPF," rather than any number of factors like genetics, obesity, or lack of exercise, that played a substantial role in causing J.L.'s multifactorial condition.

Finally, the Complaint does not address how ***these Defendants'*** products could possibly be deemed a but-for cause of the development of J.L.'s condition in light of Plaintiff's sweeping claim that "about 73% of the food in our food supply is ultra-processed and potentially addictive." Compl. ¶ 356; *see also id.* ¶ 355 (claiming that "our food supply has become dominated by UPF"); *id.* ¶ 401 (alleging that there are "more than 10,000 chemicals in our food supply" that are potentially harmful). The Complaint nowhere alleges that J.L.'s diet consisted exclusively—or even predominantly—of Defendants' products, as opposed to the many other "UPF" that Plaintiff contends are available in the marketplace. Although Defendants strongly dispute Plaintiff's broadsides against the entire food and beverage industry, they only serve to highlight the implausibility of Plaintiff's litigation theory. In short, "[w]ithout some further factual enhancement," the Complaint "stops short of the line between possibility and plausibility of entitlement to relief." *Martinez*, 2025 WL 2447793, at \*2 (quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

### III.   <u>PLAINTIFF'S CLAIMS ARE PREEMPTED BY FEDERAL LAW.</u>

The Supremacy Clause of the United States Constitution renders federal law the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. Plaintiff's lawsuit implicates express preemption, which applies when Congress enacts "federal statutory language" precluding state action in an area. *United States v. Bryan Co.*, 2012 WL 2051861, at \*3 (S.D. Miss. June 6, 2012) (citation omitted). Two such express-preemption provisions are relevant here. First, to the extent Plaintiff's claims challenge the labeling, processing, or inspection of meat or poultry products in ways that would impose requirements different from or in addition to those imposed under federal law, such claims are expressly preempted by the Federal Meat Inspection Act ("FMIA") and the Poultry

20

Products Inspection Act ("PPIA"). Second, with respect to products other than meat and poultry, the Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Nutrition Labeling and Education Act ("NLEA"), expressly preempts state-law claims that seek to impose non-identical labeling or ingredient requirements. Here, however, the Complaint's vague and conclusory allegations fail to specify how Defendants' conduct purportedly violated federal requirements, thereby preventing Defendants from meaningfully assessing which asserted theories are preempted.

### A. USDA Preemption Bars Claims Regarding Meat And Poultry Products.

Any claims challenging meat and poultry products—like those encompassed by Conagra's Chef Boyardee; Nestlé USA's Hot Pockets; and General Mills' Old El Paso brand, Compl. ¶¶ 655, 665, 685—are expressly preempted by the FMIA and PPIA. These statutes broadly prohibit states from imposing any requirements "with respect to . . . operations" of a meat or poultry product facility or "labeling, packaging, or ingredient requirements" that are "in addition to, or different than," those mandated by federal law. 21 U.S.C. § 678 (FMIA); 21 U.S.C. § 467e (PPIA). These express preemption provisions "sweep[] widely" and "'prevent[] a [s]tate from imposing any additional or different—*even if nonconflicting*—requirements" as to these broad subjects. *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1024 (10th Cir. 2022) (construing FMIA) (citation omitted) (emphasis added); *see also Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993, 997 (2d Cir. 1985) ("The FMIA and the PPIA . . . contain substantially identical preemption language.").

Comprehensive federal regulations cover virtually every aspect of meat and poultry production, from inspection of livestock, to manufacturing, processing, and labeling. *See National Meat Ass'n v. Harris*, 565 U.S. 452, 455-456 (2012) (federal law "regulates a broad range of activities" related to meat processing); 21 U.S.C. §§ 603-607 (slaughter); 9 C.F.R. § 424.21(a) (ingredients); FSIS Directive 7120.1, Safe and Suitable Ingredients Used in the Production of

21

Meat, Poultry, and Egg Products (USDA 2024); 9 C.F.R. pts. 318, 381, 424 (preparation and processing); 9 C.F.R. pts. 317, 319, 381, 412 (labeling). For instance, the FMIA permits beef products to be sold only under "labeling and containers which are not false or misleading and which are approved by the Secretary [of Agriculture]." 21 U.S.C. § 607(d). Similarly, the PPIA regulates labels for poultry-containing products. *Id.* § 451.

The USDA's Food Safety and Inspection Service ("FSIS") exercises this authority and ensures that no meat or poultry products "bear any false or misleading marking, label, or other labeling" through a comprehensive label approval program. 9 C.F.R. § 317.8(a). All meat or poultry product labels—with exceptions not relevant here—***must be submitted to and approved for use by FSIS before entering the marketplace***. *See* 9 C.F.R. § 412.1(a). And FSIS conveys its approval (in most cases) directly on the product label itself via an official legend or seal that declares the labeling was "U.S. Inspected and Passed by Department of Agriculture." *See* 21 U.S.C. § 606(a). Thus, the label of every single meat and poultry product that J.L. could have possibly ingested was expressly approved by the USDA and bears some form of this seal:



The Complaint does not suggest otherwise. Indeed, had the Complaint actually identified the particular meat or poultry products Plaintiff allegedly consumed (as opposed to broadly specifying brands that encompass dozens of different products), the Court could have taken

22

judicial notice of the fact that such products bear the official inspection legend of the USDA,[15] confirming that their labels have been pre-approved by FSIS. *See* 9 C.F.R. §§ 381.96; 412.1–412.2. Any claim that such labels should have included additional information about so-called "UPF" would impermissibly seek to impose a requirement "in addition to, or different than" the labeling mandated by the USDA. *See Thornton*, 28 F.4th at 1024 (FMIA "plainly preempts plaintiffs' labeling claims" because "FSIS has already approved defendants' labels").[16]

Plaintiff cannot evade the broad preemptive reach of the FMIA and PPIA by recasting her claims as a challenge to ingredients or processing. The USDA's authority to "prescribe 'definitions and standards of identity or compositions'" for meat and poultry products necessarily includes "the authority to prescribe their 'ingredients,'" which "is essential to determine the 'identity' of the finished product." *Armour & Co. v. Ball*, 468 F.2d 76, 81 (6th Cir. 1972); *see also Animal Legal Def. Fund Bos. v. Provimi Veal Corp.*, 626 F. Supp. 278, 279, 285-286 (D. Mass. 1986) (claims that a manufacturer should warn that its "veal might be unhealthful because it comes from calves that are fed antibiotics subtherapeutically" are preempted because they would "impose requirements in addition to or different than the federal requirements" (citation omitted)).

Applying this principle in *Brower v. Campbell Soup Co.*, a court rejected a similar attempt to skirt USDA preemption. 243 F. Supp. 3d 1124, 1126-27 (S.D. Cal. 2017). There, the plaintiffs alleged that a USDA-regulated gumbo product was harmful due to a specific ingredient—trans fat

---

[15]     Product labels and USDA seals like the example above are judicially noticeable pursuant to Federal Rule of Evidence 201(b)(2). *See Thornton v. Tyson Foods, Inc.*, 482 F. Supp. 3d 1147, 1155, 1157 (D.N.M. 2020) (finding that courts "may take judicial notice of FSIS's approval of product labels because they are matters of public record" and of the "fact that the beef labels have been approved by the USDA").

[16]     *See, e.g.*, *Kuenzig v. Hormel Foods Corp.*, 505 F. App'x 937 (11th Cir. 2013); *Webb v. Trader Joe's Co.*, 2019 WL 5578225, at *3-4 (S.D. Cal. Oct. 29, 2019); *Phelps v. Hormel Foods Corp.*, 244 F. Supp. 3d 1312, 1316-18 (S.D. Fla. 2017); *Brower v. Campbell Soup Co.*, 243 F. Supp. 3d 1124, 1128-29 (S.D. Cal. 2017); *Meaunrit v. ConAgra Foods Inc.*, 2010 WL 2867393, at *6-7 (N.D. Cal. July 20, 2010).

in the form of partially hydrogenated soybean oil—and that the labeling failed to adequately warn consumers of alleged increased risks of heart disease and other morbidity. *Id.* The court dismissed the lawsuit under the express preemption provisions of the FMIA and PPIA because the governing statutes prohibit "false or misleading" labels, and the FSIS had already reviewed and approved the product's labeling and determined that it complied with that standard. *Id.* at 1129. In short, "[t]he agency apparently found no fault" with the labeling, and allowing a jury to reach a contrary conclusion would improperly "introduce requirements in addition to or different from those imposed by the USDA." *Id*.

Plaintiff's theory of liability in this case is virtually indistinguishable from the one deemed preempted in *Brower*. Although Plaintiff does not delineate a clear definition of "UPF" in the Complaint, she does claim that foods containing hydrogenated oils and other chemically modified ingredients cause serious health conditions, including type 2 diabetes. *See* Compl. ¶¶ 35, 109, 594. But by expressly approving Defendants' meat and poultry products, the USDA effectively "found no fault" with the labeling. And the express preemption provisions of the FMIA and PPIA do not permit Plaintiff to second-guess the agency's reasoned judgment. 21 U.S.C. §§ 467, 678.

### B.  Plaintiff's Vague Pleading Improperly Attempts To Evade FDA Preemption.

The remainder of Plaintiff's claims may also be preempted, although Plaintiff's vague pleading frustrates that analysis. Congress vested the FDA with regulatory authority over food products other than meat and poultry, and tasked it with "promot[ing] the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products." 21 U.S.C. § 393(b)(1). The FDA regulates food safety, including by regulating food ingredients and labels under the FDCA, as amended by the NLEA. To effectuate that purpose, the NLEA creates a nation-wide labeling system, and broadly and expressly preempts state-law obligations "not identical" to various federal requirements. 21 U.S.C. § 343-1.

24

Here, it is unclear what particular requirements are in question because the Complaint does not identify the specific products at issue, much less specify what Defendants should have done differently with respect to the labeling, warnings, ingredients, or manufacturing regarding any such product. Plaintiff's failure to satisfy the requirements of Rule 8 therefore hinders the FDA preemption analysis. Nonetheless, it is highly likely that Plaintiff's claims, had she complied with basic pleading rules, would be preempted by the NLEA. 21 U.S.C. § 343-1. For example:

*Federal standard of identity.* Federal law also precludes any challenge with respect to the labeling or formulation of products that are subject to a federal standard of identity, such as yogurt (21 C.F.R. § 131.200) or pancake syrup (*id.* § 168.180). *See Mills v. Giant of Md., LLC*, 441 F. Supp. 2d 104, 108 (D.D.C. 2006) ("A product subject to 'a standard of identity' has a carefully delineated list of information that must appear on its label . . . . The court rejects the contention that a label with either of the warnings suggested by plaintiffs is 'identical' to a label without these warnings."), *aff'd on other grounds*, 508 F.3d 11 (D.C. Cir. 2007).

*FDA labeling requirements.* To the extent Plaintiff is claiming that any Defendant should have included different or additional disclosures on its labeling with respect to specific ingredients that are already subject to FDA labeling requirements—such as hydrogenated oils (21 C.F.R. § 101.4(b)(14)) or artificial flavoring, coloring, or preservatives (21 C.F.R. § 101.22)—those claims are also preempted. *See Turek v. General Mills, Inc.*, 662 F.3d 423, 427 (7th Cir. 2011).

*Ingredients Generally Recognized as Safe ("GRAS").* The NLEA expressly preempts any state-law claims to the extent they would impose requirements "not identical to" federal standards governing food labeling and ingredient disclosure. 21 U.S.C. § 343-1(a). Plaintiffs allege, for example, that "UPF" are defective and lack required warnings because they contain ingredients such as maltodextrin, dextrose, and invert sugar, Compl. ¶ 109, but those ingredients are generally

25

recognized as safe by federal regulations, *see* 21 C.F.R. § 184.1444 (maltodextrin); *id*. § 184.1857 (dextrose); *id.* § 184.1859 (invert sugar).

Plaintiff should not be allowed to evade the expansive reach of the NLEA's express preemption provision through vague and imprecise pleading. Even in their highly generalized form, however, Plaintiff's claims seek to impose requirements that are inconsistent with the FDCA and NLEA, and should therefore be dismissed.

## IV.    PLAINTIFF'S CLAIMS ARE BARRED BY THE FIRST AMENDMENT.

Plaintiff's claims seek to compel Defendants to convey contested scientific and policy judgments about "UPF" through mandated product warnings, including that their products contain "dangerous and unnatural combinations of nutrients" and pose chronic health risks, Compl. ¶ 708—or punish Defendants for not issuing such warnings in the past. Plaintiff seeks court-mandated, content-based warnings conveying contested scientific and policy judgments about "UPF." That violates the First Amendment's prohibition on compelled speech.

"It is well established that the First Amendment protects commercial speakers," including both the "right to speak and the right to refrain from speaking." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 279 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025). Where, as here, a plaintiff seeks to compel commercial speech on matters that are controversial and subject to ongoing scientific and political debate, the compelled message is subject to at least intermediate scrutiny. *See id.* at 283. That requires: (i) a substantial government interest; and (ii) a narrowly tailored relationship between the compelled speech and that interest. *See id.* Applying this framework, courts have repeatedly rejected attempts to "compel[] sellers to warn consumers of a potential 'risk' never confirmed by any regulatory body" or the scientific community. *National Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1282-83 (9th Cir. 2023) (given "current vigorous debate surrounding the scientific validity of glyphosate's carcinogenicity," "forcing Plaintiffs to convey that message"

26

would violate the First Amendment); *see also, e.g.*, *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478-481 (9th Cir. 2022) ("Prop. 65 acrylamide in food lawsuits are likely unconstitutional" given the "scientific debate over whether acrylamide in food causes cancer"). In fact, a court has already rejected "UPF" warning mandates similar to those Plaintiff would seek to impose here, reasoning that a Texas law mandating warning labels on foods and beverages that contain certain ingredients is likely constitutionally invalid. *American Beverage Ass'n v. Paxton*, 2026 WL 395513, at \*1 (W.D. Tex. Feb. 11, 2026).

Plaintiff's lawsuit contravenes these constitutional requirements. As already explained, Plaintiff's generalized theory that "UPF" causes chronic diseases is, at best, speculative. *Cf. Martinez*, 2025 WL 2447793, at \*2 (acknowledging "the reality that these diseases have a multitude of causes"). It also effectively challenges the overwhelming majority of our nation's food supply. Compl. ¶ 356. As a result, the speech that Plaintiff seeks to compel through Mississippi tort law is undeniably "controversial" and subject to heightened constitutional scrutiny. *Free Speech Coal.*, 95 F.4th at 281-282 (compelled statement is "uncontroversial" if its "truth . . . is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate").

Plaintiff's lawsuit does not withstand that scrutiny. Although states have a substantial interest in promoting public health, "compelling sellers to warn consumers of a potential 'risk' never confirmed by any regulatory body—or of a hazard not 'known' to more than a small subset of the scientific community—does not directly advance that interest." *National Ass'n of Wheat Growers*, 85 F.4th at 1283. Requiring warnings from only these Defendants would further undermine the asserted government interest by implying that their products uniquely pose risks while comparable products—regulated differently or sold by non-parties—do not. That selective

27

compulsion would mislead consumers and distort, rather than advance, any legitimate public-health objective.

Moreover, there are obviously far less-intrusive ways to encourage public discussion and awareness of the speculative risks underlying this lawsuit than mandating the *eight* content-based messages Plaintiff suggests should be compelled here. *See* Compl. ¶ 708; *see American Beverage Ass'n*, 2026 WL 395513, at *5 (observing that "the State could have spoken itself by conducting an advertising campaign but has not done so"). Indeed, the breadth of Plaintiff's proposed warnings (e.g., that Defendants' "UPF contain *dangerous* and unnatural combinations of nutrients," Compl. ¶ 708), would serve principally to scare consumers and "drown out[]" Defendants' legitimate commercial speech. *See National Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 778 (2018) (mandated speech impermissibly "drowns out the facility's own message"). Thus, Plaintiff's demand that Defendants warn of speculative risks that are the subject of ongoing scientific and political debate does not satisfy intermediate—much less strict—scrutiny.

Although these principles most frequently arise in litigation challenging state statutes mandating specific warnings, a state cannot accomplish by common law what it is forbidden from doing by statute. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964); *see also ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497-498 (2d Cir. 2013) (holding that "the contents of the article," which are "scientific conclusions" are not actionable under the Lanham Act, New York's General Business Law § 349, or New York state common law). Accordingly, "[w]hen a plaintiff asserts a claim based upon a defendant's failure to warn, the First Amendment may bar that claim." *Hedrick v. BSH Home Appliances Corp.*, 2025 WL 1238363, at *6 (C.D. Cal. Apr. 28, 2025) (dismissing failure-to-warn claim "because the articles" cited by plaintiff "reveal

28

that there is no scientific consensus regarding those health risks, such a warning would likely violate the First Amendment").

That principle controls here. Plaintiff's tort claims seek to force Defendants to convey Plaintiff's contested views about "UPF" and public health through mandated warnings. Because the First Amendment forbids compelling that speech directly, it also forecloses Plaintiff's attempt to impose the same result through Mississippi tort law.

## V. PLAINTIFF'S CAUSES OF ACTION FAIL FOR CLAIM-SPECIFIC REASONS.

In addition to the threshold deficiencies discussed above, each of Plaintiff's causes of action fails for independent, claim-specific reasons.

### A. Plaintiff's Failure-To-Warn/Mississippi Products Liability Act Claim (Count I) Fails For Lack Of Duty And Warning Causation.

To state a claim for failure to warn under the MPLA, a plaintiff must plausibly allege that the manufacturer had a duty to warn; that the product lacked an "adequate warning"; and that the failure to warn proximately caused the plaintiff's damages. Miss. Code Ann. § 11-1-63(a)(i)(2), (a)(ii), (a)(iii); *see Nelson v. C.R. Bard, Inc.*, 553 F. Supp. 3d 343, 351 (S.D. Miss. 2021). Plaintiff's Complaint fails to sufficiently plead these essential elements.

*No duty to warn.* Plaintiff does not plausibly allege that Defendants owed J.L. any cognizable duty to warn, much less that Defendants breached any supposed duty. Plaintiff claims that Defendants should have warned Plaintiff that "regularly, frequently, and chronically ingest[ing]" Defendants' products could lead to the development of "type 2 diabetes at nine years old." Compl. ¶¶ 590, 594, 710-712. However, the possibility that excessive consumption of any food or drink may have adverse health consequences is precisely the kind of known danger, *see* Miss. Code Ann. § 11-1-63(e), about which manufacturers have no duty to warn, *see Mills v. Giant of Md., LLC*, 508 F.3d 11, 15 (D.C. Cir. 2007) (no duty to warn of "widely known" risk that milk

29

may cause some people to experience temporary gas and related stomach discomfort); *see also, e.g.*, *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 324 (S.D.N.Y. 2006) ("The average consumer surely anticipates that a high-fat, high-protein diet would increase both cholesterol levels and the risk of heart disease.").

The Restatement (Second) of Torts—which sets forth "decades of strict liability" rules that the MPLA is meant to "codif[y]," *Nelson*, 553 F. Supp. 3d at 354—recognizes that "there is today little in the way of consumer products which will reach the consumer without" some amount of "processing before sale," and that "any food . . . necessarily involves some risk of harm, if only from over-consumption." Restatement (Second) of Torts § 402A cmts. e, i. Many of the brands listed in the Complaint have been safely enjoyed by consumers for decades. Imposing a duty to warn of food processing at the scale Plaintiff is seeking would improperly stretch the limits of the MPLA.

The Complaint never alleges that J.L. was addicted to anything at all. That omission is fatal to Plaintiff's attempt to premise a duty to warn on purported "addictive" properties. Instead of pleading addiction, Plaintiff offers only the conclusory assertion that Defendants' products are "potentially addictive." Compl. ¶ 708. Such a claim is "overly vague" where, as here, the Complaint does not identify what specifically about any of Defendants' products supposedly renders them addictive. *Pelman*, 237 F. Supp. 2d at 542. Nor does Plaintiff allege whether the purported risk is based on isolated—as opposed to prolonged or compulsive—consumption of Defendants' products. *See id.* To the contrary, the Complaint alleges that J.L. consumed some products as infrequently as twice a year and others only a handful of times per month or week, *see id.* ¶¶ 605, 615, 635—facts wholly inconsistent with any plausible claim of addiction.

30

Courts have repeatedly rejected efforts to survive dismissal by invoking addiction in the abstract, without factual allegations that addiction actually existed. "To allow a complaint to survive merely because it alleges product liability on the basis of addiction would be to allow any complaint that alleges product liability based on the addictive nature of the products to survive dismissal, even where such addiction is likely never to be proven." *Pelman*, 237 F. Supp. 2d at 542; *see also Garrison v. Heublein, Inc.*, 673 F.2d 189, 189 n.2, 190-191 (7th Cir. 1982) (affirming dismissal of complaint alleging that plaintiffs suffered injuries after 20 years of vodka consumption and that vodka has propensities "to be addictive"); *Bruner v. Anheuser-Busch, Inc*., 153 F. Supp. 2d 1358, 1359-60 (S.D. Fla. 2001) (dismissing claim that consumers were misled by advertising that beer "was safe, to consume and was not addictive"). Absent plausible allegations of addiction, Plaintiff cannot transform ordinary, commonsense risks inherent in food consumption into a cognizable failure-to-warn claim.

*No proximate causation.* Even if Defendants had a duty to warn, Plaintiff has failed to plausibly allege that any failure to warn proximately caused Plaintiff's alleged injuries. *See 3M Co. v. Johnson*, 895 So. 2d 151, 166 (Miss. 2005) ("[T]he failure to warn must be the proximate cause of the injuries suffered or it is irrelevant."). Plaintiff hypothesizes that, had Defendants warned J.L. that their products "would increase the[] risk of being seriously injured, . . . [J.L.] would not have started ingesting and/or using their [products]." Compl. ¶ 712. But that is a "formulaic recitation" of the warning-causation element that cannot be credited under Rule 8. *Iqbal*, 556 U.S. at 678. It is also implausible in light of Plaintiff's other allegations that purported "concerns about ultra-processing" have been a matter of public debate since the 1950s. *See* Compl. ¶ 396; *see also, e.g.*, *id.* ¶¶ 395-400; *id.* ¶¶ 463-467, 481-487, 491-532. And despite acknowledging that Defendants' products contain clear nutritional labels, *id.* ¶ 112, which include

ingredient lists and suggested serving sizes, Plaintiff's caregivers continued to purchase those products for J.L.'s consumption at least until J.L.'s diagnosis at age nine. *See id.* ¶¶ 590, 605. These allegations belie Plaintiff's conclusory allegation that a warning would have given J.L. or his parents "information that they did not already know and that they would have acted upon that new information in a manner that would have avoided the injuries." *3M*, 895 So. 2d at 166.

**B.  Plaintiff's Design Defect/Mississippi Products Liability Act Claim (Count II) Fails Because She Does Not Plead Either A Defect Or The Existence Of An Alternative, Feasible Design.**

To state a design-defect claim under the MPLA, a plaintiff must allege not only that "[t]he product was designed in a defective manner" but also that "there existed a feasible design alternative that would have to a reasonable probability prevented the harm . . . without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code Ann. § 11-1-63(a)(i)(3), (f)(ii); *see also Williams v. Bennett*, 921 So. 2d 1269, 1274 (Miss. 2006) (under the MPLA, a "product's design is *unreasonably dangerous only if the plaintiff proves the required elements* of a claim as set forth by the Act"). This second requirement reflects the principle that design-defect liability attaches only where the alleged harm was "reasonably preventable" through a different design, and it "is elemental to a claimant's prima facie case." *Williams*, 921 So. 2d at 1275. Plaintiff has not plausibly pled either of these required elements.

*No defect.* The Complaint does not identify "what was defective about the design" of Defendants' products. *Mullen v. Bell Helicopter Textron, Inc.*, 2015 WL 11120331, at *2 (S.D. Miss. Aug. 17, 2015) (Guirola, J.) (dismissing design-defect claim). At most, the Complaint claims, in generic terms, that Defendants' products are "unreasonably dangerous" because they "were engineered to be addictive" and "promote overconsumption," and "they contained dangerous and unnatural combinations of nutrients" and ingredients. Compl. ¶¶ 723-724. But Plaintiff "fails to offer any factual support for these conclusory allegations." *Deese v. Immunex*

32

*Corp.*, 2012 WL 463722, at *2-3 (S.D. Miss. Feb. 13, 2012) (rejecting "conclusory allegations" that drug was "unreasonably dangerous"). In particular, Plaintiff does not challenge a single specific characteristic that is common to the dozens of diverse sports drinks, pastas, desserts, yogurts, snacks, and other foods and beverages encompassed by her list of brands—each of which "has different ingredients and manufacturing processes." *Martinez*, 2025 WL 2447793, at *3. In short, Plaintiff never "explain[s]—even in the simplest terms—what the defect is" in any particular product. *Austin v. Bayer Pharms. Corp.*, 2013 WL 5406589, at *6 (S.D. Miss. Sept. 25, 2013) ("Plaintiff did not allege any facts indicating how Mirena is defective in design[.]").

***No feasible alternative design.*** Plaintiff also fails to allege the existence of a feasible alternative design. The only proffered alternative is "food that was not ultra-processed." Compl. ¶ 724. But that is not an alternative design; rather, it is a demand that Defendants manufacture "***entirely different***" products. *Elliott v. El Paso Corp.*, 181 So. 3d 263, 272-273 (Miss. 2015) (emphasis added) ("Requiring an entirely different warning system, or requiring the affected public to use gas detectors in their homes, is not a feasible alternative design for natural-gas odorant."); *see also Young v. Bristol-Myers Squibb Co.*, 2017 WL 706320, at *11 (N.D. Miss. Feb. 22, 2017) (dismissing design defect claim because plaintiff "attempts to satisfy her alternative design burden by pointing not just to a different drug but to a different class of drugs").

Plaintiff alleges as much in the Complaint. In Plaintiff's words, "UPF" "are imitations of food," "not modified foods," Compl. ¶ 109, and "are fundamentally different than the foods that make up traditional diets," *id.* ¶ 108. Plaintiff describes "UPF" as containing "low-cost ingredients" and having a "long shelf-life," *id.* ¶ 113, making these foods and drinks "cheap" and "easily accessible," *id.* ¶ 293—characteristics that contribute to the "utility, usefulness, practicality, [and] desirability of" Defendants' products. Miss. Code Ann. § 11-1-63(f)(ii). The

33

Complaint does not allege that any specific ingredient could have been removed, any formulation could have been modified, or any manufacturing process could have been changed in a way that would have avoided J.L.'s condition "without impairing the utility, usefulness, practicality or desirability" of Defendants' products. *Id.*

### C. <u>Plaintiff's Fraud And Deception-Based Claims (Counts III-V) Fail For Multiple Reasons.</u>

Plaintiff has asserted a variety of claims purportedly based on alleged misrepresentations and deceptive conduct: negligent misrepresentation (Count III); fraud/fraudulent concealment (Count IV); and deceptive advertising (Count V). As a threshold matter, these claims are barred by the MPLA's exclusivity provision, which provides that "'the MPLA provides the *exclusive* remedy for products-liability claims' such that all non-MPLA claims based on damages caused by a product fail as a matter of law." *Fozard v. Knauf Gips KG*, 2024 WL 2158267, at *3 (S.D. Miss. May 13, 2024) (quoting *Elliott*, 181 So. 3d at 268-269 (emphasis added)); *see also, e.g.*, *Young*, 2017 WL 706320, at *4 (dismissing plaintiff's negligent misrepresentation and fraud claims as "subsumed" by the MPLA); *Gardley-Starks*, 917 F. Supp. 2d at 602 ("Numerous district courts have recognized that the MPLA subsumes common law . . . misrepresentation claims based on a defective product.") (collecting authorities) (internal quotation marks and citation omitted).

In any event, as explained below, Plaintiff's claims fail regardless of whether they are evaluated under the MPLA, common law, or Mississippi's deceptive advertising statute.

#### 1.  Plaintiff does not adequately allege any false statement or reliance.

Although Counts III-V have different labels, each one requires both a misrepresentation (or deceptive act) and reliance. *See, e.g.*, Miss. Code Ann. § 11-1-63(a)(i)(4) (under MPLA, manufacturer can be held liable if product "failed to conform to . . . express factual representations upon which the claimant justifiably relied in electing to use the product"); *Woods v. R.J. Reynolds*

*Tobacco Co.*, 635 F. Supp. 2d 530, 535 (S.D. Miss. 2009) (fraudulent misrepresentation); *Harris v. Brush Engineered Materials, Inc.*, 2005 WL 3806048, at *2 (S.D. Miss. Feb. 18, 2005) (Guirola, J.) (fraudulent concealment); *Arnona v. Smith*, 749 So. 2d 63, 66-67 (Miss. 1999) (negligent misrepresentation); *Dixieland Food Stores, Inc. v. Kelly's Big Star, Inc.*, 391 So. 2d 633, 636 (Miss. 1980) (claim under Miss. Code Ann. § 97-23-3 requires proof that a "deceptive or misleading" act proximately caused an ascertainable loss). Plaintiff has not sufficiently pled these elements under Rule 8, much less under the "strict[]" particularity requirements of Rule 9(b). *M St. Invs.*, 2014 WL 1326105, at *3; *see also Courson v. Cordis Corp.*, 2018 WL 3058867, at *4 (N.D. Miss. June 20, 2018) (applying particularity requirement to claims for fraud, concealment, and negligent misrepresentation).

*No misrepresentation.* Plaintiff has not identified a specific misrepresentation made by any Defendant. She does not point to a single specific label, commercial, or other statement for purposes of these Counts, much less any one that is false or misleading. Instead, the Complaint baldly asserts that Defendants represented that their "UPF" "have no serious side effects," Compl. ¶ 738 (negligent misrepresentation), that each of these supposed representations was "done []" fraudulently," *id.* ¶ 753 (fraud/concealment), and that each Defendant engaged in unspecified "deceptive, and/or misleading advertising" by "[m]isleading consumers regarding the safety risks associated with use of their UPF," "[e]xcessively advertising . . . their UPF," and "[f]ailing to disclose the safety risks associated with their UPF," *id.* ¶ 786 (deceptive advertising). These allegations fail to identify any representation that could support these claims, and do not come close to pleading "the 'who, what, when, and where' with the particularity Rule 9(b) requires." *Courson*, 2018 WL 3058867, at *4 (quoting *Williams*, 112 F.3d at 178) (dismissing fraud, negligent misrepresentation, and concealment claims for lack of particularity); *see Pace v. Cirrus*

*Design Corp.*, 93 F.4th 879, 889-892 (5th Cir. 2024) (affirming the dismissal of fraudulent misrepresentation claims against two Mississippi defendants because "the critical element of misrepresentation is the false statement itself," and "none of [the plaintiff's] allegations separately identif[ied] the roles of individual defendants").

To the extent the Complaint discusses any specific marketing, Plaintiff does not specify what (if anything) is false or misleading about the advertisements. Plaintiff cites a number of purported advertisements from each Defendant (except Kellanova and Coca-Cola). For example, Plaintiff references a couple YouTube videos involving OREO Cookies, asserting that Mondelēz "targets children with UPF using Super Mario characters, television ads, interactive websites, and co-branding with children's movie characters." Compl. ¶ 326. And the Complaint includes screenshots of television ads allegedly from Post Holdings that supposedly "encourag[e] children to eat its UPF." *Id.* ¶ 327. But nowhere in the Complaint does Plaintiff specify what is allegedly false or misleading about any of this marketing, foreclosing all of her fraud-based claims. *See, e.g.*, *Williams*, 112 F.3d at 178-179 (dismissing complaint for failure to plead fraud with particularity because plaintiffs made "no[] attempt to parse the articles [attached to the complaint] to demonstrate which statements were fraudulent and attributable to" which defendants, and noting that "[a] complaint can be long-winded, even prolix, without pleading with particularity"); *Elson v. Black*, 56 F.4th 1002, 1009-10 (5th Cir. 2023) (affirming dismissal of fraud claims where plaintiffs failed "to plead adequately *what* representations were actually made, *when* those representations were made, *who* made the representations, and *where* those representations occurred"). In fact, in some instances, the brands in the identified advertisements (like Doritos, Cheetos, Lunchables, and Kid Cuisine) do not even match the brands Plaintiff allegedly consumed.

36

*No reliance.* Plaintiff does not allege the essential element of reliance. At most, Plaintiff offers conclusory allegations that "[t]he minor-Plaintiff and other consumers justifiably relied on each Defendants' respective misrepresentations and nondisclosures to their detriment." Compl. ¶ 745 (negligent misrepresentation); *see also id.* ¶¶ 768, 797 (similar with respect to fraud/concealment and deceptive advertising claims). But to survive a motion to dismiss, Plaintiff must plead how the people responsible for purchasing Defendants' products relied on Defendants' marketing. *See Young*, 2017 WL 706320, at *16 (dismissing claims for fraud and negligent misrepresentation because "the complaint wholly fails to plead when these documents were published or *how Young herself relied on them*") (emphasis added); *see also Terry v. N L Indus., Inc.*, 2007 WL 1484742, at *2 (N.D. Miss. May 17, 2007) ("nothing in the Amended Complaint establishes the necessary link between defendant's alleged misstatements and actions taken by plaintiffs in reliance thereon"). Here, Plaintiff does not even allege that J.L. or his caregivers ever saw *any* of the specific marketing highlighted in the Complaint for any of the brands that allegedly caused his harm—nor does the Complaint offer facts sufficient to plausibly allege that whoever purchased the products for him justifiably relied on that advertising.

Plaintiff's conclusory claims of reliance are also implausible in light of other allegations in the Complaint. After all, much of the marketing highlighted by Plaintiff aired well *after* J.L.'s 2019 diabetes diagnosis and concerned brands (like Lunchables, Mission Mac & Cheese, or Lucky Charms) that J.L. is not alleged to have consumed. *Compare id*. ¶¶ 325-328, 346 & n.320 (highlighting advertisements from 2019, 2020, 2021, 2022, and 2023 pertaining to Mission Mac & Cheese Shapes, OREO Limited Edition Cookies, Fruity Pebbles cereal, Lucky Charms, and Lunchables); *with id*. ¶¶ 605, 615, 625, 635, 645, 655, 665, 675, 685, 695 (listing brands of foods and beverages J.L. consumed). And although Plaintiff repeatedly claims that supposed "concerns"

37

about "UPF" were publicly available for decades, Compl. ¶ 396, J.L.'s caregivers continued to purchase certain of Defendants' foods and beverages for his consumption at an allegedly consistent rate until his diagnosis. *Id.* ¶¶ 590, 605. Thus "the allegations" "negate" the key element of justifiable reliance. *Green v. Specialized Loan Servicing, LLC*, 2022 WL 704203, at *4 (N.D. Miss. Mar. 8, 2022) ("The plaintiffs' assertions are inconsistent with a fraud claim."); *see also Taylor v. S. Farm Bureau Cas. Co.*, 954 So. 2d 1045, 1050 (Miss. Ct. App. 2007) (plaintiff "had ample opportunity to investigate" the alleged fraud but "chose not to" and, thus, "failed to present a prima facie case in her complaint establishing . . . reasonable reliance on the representations").

### 2. Plaintiff's fraudulent concealment claim also fails for lack of duty.

Plaintiff's fraudulent concealment claim separately and additionally fails for lack of any recognized duty to disclose. As this Court has recognized, "in Mississippi, the mere silence or nondisclosure of material facts by a manufacturer does not support a finding of fraudulent concealment brought by the ultimate consumer." *Harris*, 2005 WL 3806048, at *2. This is so because product manufacturers do not have the kind of relationship with the consumer required to impose a duty to disclose information. *See, e.g.*, *id.* (dismissing concealment claim because "[t]here is no indication in Plaintiffs' Amended Complaint that [defendant] ever had any dealings or communicated directly with any Plaintiff, and in fact it appears that the relationship is quite attenuated"); *Woods*, 635 F. Supp. 2d at 538 (dismissing concealment claim "[b]ecause the plaintiff has failed to plead . . . any basis for a fiduciary or other confidential relationship between the [smoker] and the [tobacco companies]"). Here, the Complaint does not allege that Defendants had *any* (let alone a fiduciary) relationship with J.L. or his caregivers capable of triggering a duty to disclose under Mississippi law.

38

**D. Plaintiff's Conspiracy (Count VI) And Aiding and Abetting/Concerted Action (Count VII) Claims Also Fail For Multiple Reasons.**

Plaintiff's claims for conspiracy and aiding and abetting/concerted action against six of the Defendants—Kraft Heinz, Mondelēz International, Post, Coca-Cola, General Mills, and Mars—are just as deficient as her other claims. For starters, these are not among the theories enumerated in the MPLA, *see* Miss. Code Ann. § 11-1-63, which (as previously discussed) "provides the exclusive remedy" for claims arising out of purportedly defective products. *Fozard*, 2024 WL 2158267, at *3. Further, Count VII—"aiding and abetting unlawful conduct – concerted action"—purports to assert a common-law claim that no Mississippi court has ever recognized. *See, e.g.*, *Dickens*, 2018 WL 5726206, at *1 (concert-of-action has "never been recognized in Mississippi"); *In re On-Site Fuel Serv., Inc.*, 2020 WL 3712868, at *25-27 (Bankr. S.D. Miss. May 8, 2020) (dismissing aiding-and-abetting claim for similar reason). As a federal court exercising diversity jurisdiction, this Court should dismiss "novel causes of action not yet recognized by the state courts." *In re DePuy Orthopedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018) (rejecting aiding-and-abetting theory under Texas law).[17]

More fundamentally, to survive a motion to dismiss conspiracy-based claims, a plaintiff must plead both underlying tortious activity and an agreement to act unlawfully. *See Harris*, 2005 WL 3806048, at *3 (dismissing claim for failure to adequately plead these essential elements); *Fikes v. Wal-Mart Stores, Inc.*, 813 F. Supp. 2d 815, 822 (N.D. Miss. 2011) ("Assuming, without deciding, that the Mississippi Supreme Court would recognize the tort of aiding and abetting . . .

---

[17] This Court previously predicted that Mississippi would recognize a claim for aiding and abetting a conspiracy, *Dickens*, 2018 WL 5726206, at *3, but more recent federal authority has "rel[ied] on *DePuy*" in "hold[ing] that in the absence of any direct pronouncement by Mississippi courts . . . no such claim exists in Mississippi." *In re On-Site Fuel Serv.*, 2020 WL 3712868, at *25-27; *see also Landrum v. Livingston Holdings, LLC*, 396 So. 3d 1026, 1047 (Miss. 2024) (declining to review dismissal of aiding-and-abetting claim). In any event, as set forth in text, Plaintiff has not pled the essential elements of a conspiracy.

the Complaint fails to state a claim for civil aiding and abetting for the same reasons it fails to state a claim for civil conspiracy."); *see also* Restatement (Second) of Torts § 876(b) (aiding-and-abetting liability requires evidence that defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement"). And when the underlying allegations sound in fraud, these elements must be pled with "specificity." *Dickens*, 2018 WL 5726206, at *2; *see also M St. Invs.*, 2014 WL 1326105, at *3-4 (particularity "standard also applies to pleading a state law claim of conspiracy to commit fraud"). Plaintiff has not alleged these essential elements under either Rule 8 or Rule 9(b).

### 1. Plaintiff has not alleged an underlying tort.

In Mississippi, civil conspiracy and aiding and abetting (even when recognized) cannot survive "[w]ithout an existing anchor claim[.]" *Otis v. Mississippi Sand Sols., LLC*, 2021 WL 6882335, at *8 (S.D. Miss. Jan. 26, 2021) ("Without an existing anchor claim, Plaintiffs' conspiracy claim fails as well."); *Fikes*, 813 F. Supp. 2d at 822-823 (dismissing civil conspiracy and aiding-and-abetting claims where "Plaintiffs have not alleged a separate underlying tort which could support" them). Here, there is no "existing anchor claim" for all of the reasons previously discussed. In particular, Plaintiff has failed to tie any product manufactured by any Defendant to J.L.'s alleged injuries; she has not pled that any Defendants' products were defective; and she has not identified a particular misrepresentation by any Defendant or reliance on such a representation. These fundamental pleading deficiencies require dismissal of Plaintiff's claims for conspiracy and aiding and abetting/concerted action.

### 2. Plaintiff does not plausibly allege an agreement to accomplish an unlawful result.

Plaintiff also fails to plausibly allege the most basic element of a conspiracy: an agreement.

"It is elementary that a conspiracy requires an agreement between the co-conspirators." *Green Hills Dev. Co., LLC v. Oppenheimer Funds, Inc.*, 2020 WL 376659, at *9 (S.D. Miss. Jan. 23, 2020) (quoting *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786-787 (Miss. 2004)). Moreover, the alleged conspirators "must be aware of the fraud or wrongful conduct at the beginning of the agreement." *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018) (citation omitted). Thus, a conspiracy claim "must raise 'a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Goode v. City of Southaven*, 2019 WL 3082735, at *11 (N.D. Miss. May 1, 2019) (challenged conduct, "at most, amount[s] to parallel conduct and independent actions taken by each defendant through their own review and judgment of the situation") (citation omitted), *aff'd sub nom. Goode v. Baggett*, 811 F. App'x 227 (5th Cir. 2020); *see also Twombly*, 550 U.S. at 564 (conspiracy count failed to a claim because it rested "on descriptions of parallel conduct and not on any independent allegation of actual agreement").

Plaintiff's conspiracy allegations do not satisfy these requirements because they are directed at "the UPF industry" writ large. *See, e.g.*, Compl. ¶ 554. Plaintiff does not identify its members, specify when they joined the alleged conspiracy, or delineate their alleged wrongful conduct. *See Walker v. Smith*, 2017 WL 946689, at *3 (S.D. Miss. Mar. 8, 2017) (dismissing civil conspiracy claims where plaintiff "fails to even identify who the alleged conspirators are"). Additionally, despite asserting that the "conspiracy has been in existence for at least 25 years," *see* Compl. ¶ 817, Plaintiff does not describe the content of any unlawful communications between its members or point to any intentional collaboration among its members. *See Intent Performance LLC v. Intent Sports & Fitness, LLC*, 2025 WL 1601045, at *16-17 (S.D. Miss. June 5, 2025) (dismissing civil conspiracy claim because the plaintiff did not adequately plead the "nature or the

contours of the supposed illegal agreement"), *appeal dismissed sub nom. Intent Performance, L.L.C. v. Intent Sports & Fitness, L.L.C.*, 2025 WL 3900530 (5th Cir. Oct. 16, 2025). Instead, Plaintiff generically alleges that "UPF companies" spent money lobbying or sponsoring scientific research. *See, e.g.*, Compl. ¶¶ 558 (political lobbying), 565 (scientific research). Putting aside the fact that lobbying governments and funding research are constitutionally protected forms of speech, *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994), Plaintiff alleges nothing to suggest that any alleged conspirator agreed with another to engage in this protected conduct. *See Dickens*, 2018 WL 5726206, at *2 (general allegations that "'the Defendants' and some unidentified group of non-parties conspired with each other to suppress information'" "do not meet the specificity requirements of" Rule 9(b)).

The closest Plaintiff comes to even attempting to plead an agreement is claiming that some executives once "sat together in the same room" and "were told" of one individual's belief that food companies were responsible for certain public health consequences, including increased childhood obesity. Compl. ¶¶ 584-585. Even if that were true, Plaintiff expressly acknowledges that "the presentation was a failure" and "nothing was done"—i.e., the meeting did not lead to any agreement among the attendees. *Id*. ¶ 554. Instead, what Plaintiff deems the "UPF industry" continued doing what the unspecified companies had each been doing before the alleged meeting. *Id*. In other words, Plaintiff does not even suggest (much less plausibly plead) that any of the attendees' companies developed, marketed, or sold products in any way other than one that followed from preexisting competition. Simply put, the lynchpin of Plaintiff's conspiracy/aiding and abetting theory—a 1999 meeting—forecloses the notion of any agreement.

Finally, even if an agreement could be inferred from the occurrence of one meeting nearly three decades ago, Plaintiff does not plausibly allege that the specific purpose of it was "***to***

42

*accomplish an unlawful purpose or a lawful purpose unlawfully.*" *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 495 (5th Cir. 2019) (emphasis added) (quoting *Rex Distrib. Co. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019)). To the contrary, Plaintiff explicitly pleads that the six Defendants acted "to advance their financial interests," Compl. ¶ 808, and secure a share of the food market, *see id.* ¶ 816; *see also, e.g.*, *id.* ¶ 16 ("formulation strategies were quickly adopted throughout the UPF industry, with the goal of driving consumption, and Defendants' profits"); *id.* ¶¶ 534-589 (similar allegations). These allegations only confirm that the alleged conspiratorial acts that Plaintiff attributes to the six Defendants "could just as well be," and indeed are, "independent action[s]" resulting from a highly competitive marketplace. *Goode*, 2019 WL 3082735, at *11; *see also Gilmer v. McRae*, 355 So. 3d 219, 225 (Miss. 2022) (affirming dismissal of civil conspiracy claim because the plaintiff "did not allege what unlawful purpose was accomplished or what particular law was violated").

In short, Plaintiff has done nothing more than vaguely describe competitors' participation in the ever-evolving food market, which falls short of pleading any meeting of the minds, let alone an agreement to commit a tortious act.

## VI. THE COURT SHOULD DISMISS ALL OF PLAINTIFF'S CLAIMS AGAINST MONDELĒZ INTERNATIONAL AND POST HOLDINGS FOR LACK OF PERSONAL JURISDICTION.

The Court should separately dismiss Defendants Mondelēz International and Post Holdings under Rule 12(b)(2) for lack of personal jurisdiction. The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant *only* when it has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with that state. *Mullen v. Bell Helicopter Textron, Inc.*, 144 F. Supp. 3d 884, 887 (S.D. Miss. 2015) (Guirola, J.); *Davenport v. HansaWorld USA, Inc.*, 23 F. Supp. 3d 679, 696 (S.D. Miss. 2014) (dismissing holding company for lack of personal jurisdiction). "Personal

jurisdiction may be general or specific." *Pitts v. Ford Motor Co.*, 127 F. Supp. 3d 676, 682 (S.D. Miss. 2015) (citing *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006)). Mondelēz International and Post Holdings are not subject to either form of jurisdiction.

*First*, Mondelēz International and Post Holdings are not subject to general jurisdiction in Mississippi under the exacting standards set forth in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), because they are not "at home" here, *see Johnson v. theHuffingtonPost.com, Inc.*, 21 F.4th 314, 323 (5th Cir. 2021) ("[D]efendant's ties with the state must be so pervasive that he is 'essentially at home' there."). For a corporation, the "paradigm" forums for general jurisdiction are the corporation's state of incorporation and its principal place of business. *See Daimler*, 571 U.S. at 118; *Pitts*, 127 F. Supp. 3d at 682 (finding no general jurisdiction because the "record is clear that Ford is neither incorporated nor has its principal place of business in Mississippi"). Here, Mondelēz International is incorporated in Virginia, and its principal place of business is in Chicago, Illinois. East Decl. ¶ 5. Post Holdings is incorporated in Missouri, and its principal place of business is in Missouri. Gray Decl. ¶ 5. These Defendants are therefore not subject to general jurisdiction.

*Second*, Mondelēz International and Post Holdings are also not subject to specific jurisdiction in this Court. The touchstone of specific jurisdiction is that the claims "arise[] out of or relate[] to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262, 265 (2017) (citation omitted). Although the Complaint alleges that both Mondelēz International and Post Holdings have "derived substantial revenue from goods and products sold and/or used in the State of Mississippi," Compl. ¶¶ 55-56, 62-63, both of these Defendants are mere holding companies that do not even transact any business in Mississippi. *See* East Decl. ¶¶ 6-9; Gray Decl. ¶¶ 6-7. Nor did either Defendant develop, manufacture, test, market,

or sell any of the products or brands named in Plaintiff's Complaint.[18] *See* East Decl. ¶¶ 6-9; Gray Decl. ¶¶ 7, 9-10. As a result, they have not "purposefully availed" themselves of Mississippi's laws, let alone in a way that gave rise to Plaintiff's claims. *See Sellers v. Volkswagen AG, Volkswagen of Am., Inc.*, 2022 WL 4088185, at \*4 (S.D. Miss. Sept. 6, 2022) (granting parent company's motion to dismiss where evidence demonstrated that it did not manufacture or sell the allegedly defective vehicles).[19]

The fact that Mondelēz International and Post Holdings are the parent companies of subsidiaries that did manufacture and sell products allegedly consumed by Plaintiff does not support a different conclusion. "[A] foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there." *Davenport*, 23 F. Supp. 3d at 697. And although the "presumption of institutional independence may be rebutted," there must be "*clear evidence* that the two corporations are fused for jurisdictional purposes." *Conti 11. Container Schiffarts-GMBH & Co. KG M.S., MSC Flaminia v. MSC Mediterranean Shipping Co. S.A.*, 91 F.4th 789, 800-801 (5th Cir. 2024) (cleaned up) (emphasis added). Here, the Complaint does not even attempt to allege any lack of corporate separateness. Moreover, the evidence submitted by Mondelēz International and Post Holdings demonstrates that they and their

---

[18]    Mondelēz International is the parent company of Mondelēz, which has developed, manufactured, marketed, and sold food and beverage products in the United States, including for brands named in Plaintiff's Complaint. East Decl. ¶ 11. Post Holdings is a consumer packaged goods holding company. One of the companies that Post Holdings holds is Post Consumer Brands, LLC ("Post Consumer Brands"). Gray Decl. ¶ 8. Post Consumer Brands is the entity responsible for the design, manufacture, labeling, marketing, and sale of the Honey-Comb® brand cereal that Plaintiff allegedly consumed. *Id.* ¶¶ 9-10. Counsel for Mondelēz International and Post Holdings have been meeting and conferring with Plaintiff's counsel on dismissing these two Defendants and substituting the proper entities, but have not yet been able to reach an agreement.

[19]    This evidence similarly precludes satisfaction of Mississippi's long-arm statute. *See Dickens v. A-1 Auto Parts & Repair, Inc.*, 2018 WL 11393945, at \*2 (S.D. Miss. Nov. 2, 2018) (Guirola, J.) (requirements of long-arm statute not satisfied based on affidavit showing that defendant holding company did not do any business in Mississippi and did not manufacture or sell the product in question in Mississippi or anywhere).

subsidiaries "are in fact distinct entities." *Id.* at 801 (reversing and remanding with instructions to dismiss holding company for lack of jurisdiction). For example, Post Holdings does not direct or control the daily operations of Post Consumer Brands, and both companies maintain separate and distinct executive leadership teams.  Gray Decl. ¶¶ 13-18. The same is true with respect to Mondelēz International and Mondelēz. (East Decl. ¶¶ 13-17.)

For all of these reasons, the Court should separately dismiss all claims against Mondelēz International and Post Holdings for lack of personal jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice.

Dated: May 1, 2026

Respectfully submitted,

*/s/ M. Patrick McDowell*
M. Patrick McDowell (MB No. 9746)
Stephen J. Carmody (MB No. 8345)
BRUNINI, GRANTHAM, GROWER &
HEWES, PLLC
190 East Capitol Street, Suite 100 (39201)
Post Office Drawer 119
Jackson, MS 39205
T: 601-948-3101
pmcdowell@brunini.com
scarmody@brunini.com

Lauren S. Colton (*pro hac vice*)
Julie R. Schindel (*pro hac vice*)
HOGAN LOVELLS US LLP
100 International Drive Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2700
Facsimile: (410) 659-2701
lauren.colton@hoganlovells.com
julie.schindel@hoganlovells.com

*Counsel for Defendant Nestlé USA, Inc.*

46

*/s/ E. Barney Robinson III*
E Barney Robinson III (MSB # 09432)
BUTLER SNOW LLP
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) barney.robinson@butlersnow.com

Michael C. McCabe (MSB #101548)
BUTLER SNOW LLP
1300 Twenty Fifth Avenue, Suite 204
Gulfport, MS 39501
P.O. Drawer 4248
Gulfport, MS 39502-4248
(P) (228) 575-3033
(F) (228) 868-1531
(E) michael.mccabe@butlersnow.com

Andrew S. Tulumello (*pro hac vice*)
Arianna Scavetti (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(P) (202) 682-7000
(E) drew.tulumello@weil.com
(E) arianna.scavetti@weil.com

Brian G. Liegel (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
(P) (305) 577-3180
(E) brian.liegel@weil.com

*Counsel for Defendant PepsiCo, Inc.*

*/s/ Paul Rosenblatt*
Paul Rosenblatt (MB No. 104223)
KIRKLAND & ELLIS LLP
150 3rd Avenue South, Suite 1220
Nashville, TN 37201
Telephone: (629) 222-0114
Email: paul.rosenblatt@kirkland.com

47

Jessica Davidson (Admitted *Pro Hac Vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

Jordan Michael Schwartz (Admitted *Pro Hac Vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 389-3358
jordan.schwartz@kirkland.com

*Counsel for Mondelēz International, Inc.*

*/s/ James J. Crongeyer, Jr.*
James J. Crongeyer, Jr. (MSB #10536)
James M. Tyrone (MSB #102381)
Watkins & Eager PLLC
400 East Capitol Street, Suite 300 (39201)
Post Office Box 650
Jackson, MS 39205
Telephone: 601-965-1900
Facsimile: 601-965-1901
jcrongeyer@watkinseager.com
mtyrone@watkinseager.com

Stephen D. Andrews (*pro hac vice* #60932)
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone: 202-434-5000
Fax: 202-434-5029
SAndrews@wc.com

*Counsel for Defendants Mars, Incorporated (improperly named as Mars Incorporated, Inc.) and Kellanova*

/s/ *Ben Bryant*
Benjamin Bryant (103623)
BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400

48

Jackson, MS 39201
Tel: (601) 965-8171
Fax: (601) 961-4466
Email: bbryant@balch.com

*Counsel for Defendant The Kraft Heinz
Company*

/s/Angela M. Spivey_____
Angela M. Spivey (MB No. 10572)
Andrew G. Phillips (*pro hac vice*)
Jamie S. George (*pro hac vice*)
Esmat Hanano (*pro hac vice*)
angela.spivey@alston.com
andrew.phillips@alston.com
jamie.george@alston.com
esmat.hanano@alston.com
ALSTON & BIRD LLP
1201 West Peachtree St.
Atlanta, GA 30309
Tel: (404) 881-7000

Kyle S. Moran (MB No. 10724)
Adam B. Harris (MB No. 102955)
Kyle.Moran@phelps.com
Adam.Harris@phelps.com
PHELPS DUNBAR LLP
2602 13th Street, Suite 300
Gulfport, MS 39501
Tel: (228) 679-1130

*Counsel for Defendant The Coca-Cola Company*

/s/ Kaytie M. Pickett
Kaytie M. Pickett (MSB No. 103202)
Adam Stone (MSB No. 10412)
Kristine L. Callahan (MSB No. 106630)
JONES WALKER LLP
3100 North State St., Suite 300
Jackson, MS 39216
Tel: 601.949.4900
Facsimile: 601.949.4804
kpickett@joneswalker.com
astone@joneswalker.com
kcallahan@joneswalker.com

49

Dean N. Panos, *pro hac vice*
John F. Ward, Jr., *pro hac vice*
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: 312.222.9350
dpanos@jenner.com
jward@jenner.com

*Counsel for Defendant WK Kellogg Co*

/s/  *J. William Manuel*
J. William Manuel (MB No. 9891)
Jason Tullos (MB No. 106703)
Bradley Arant Boult Cummings LLP
One Jackson Place
188 E. Capitol Street, Suite 1000
Jackson, Mississippi 39201
T: (601) 948–8000 F: (601) 948–3000
wmanuel@bradley.com
jtullos@bradley.com

Sarah L. Brew (*pro hac vice*)
Tyler A. Young (*pro hac vice*)
Rory F. Collins (*pro hac vice*)
Faegre Drinker Biddle & Reath LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
T: (612) 766-7000 F: (612) 766-1600
sarah.brew@faegredrinker.com
tyler.young@faegredrinker.com
rory.collins@faegredrinker.com

*Counsel for Defendant Post Holdings, Inc.*

*/s/ J. Cal. Mayo, Jr.*
J. Cal Mayo, Jr. (MB No. 8492)
Mayo Mallette PLLC
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
T: (662) 236-0055
F: (662) 236-0035
cmayo@mayomallette.com

50

S. Jamal Faleel (admitted pro hac vice)
Jaime Wing (admitted pro hac vice)
Norton Rose Fulbright US LLP
60 South Sixth Street, Suite 3100
Minneapolis, Minnesota 55402
T: (612) 321-2800
F: (612) 321-2288
jamal.faleel@nortonrosefulbright.com
jaime.wing@nortonrosefulbright.com

*Counsel for Defendant General Mills, Inc.*

*/s/ J. Carter Thompson, Jr.*
J. Carter Thompson, Jr. (MSB # 8195)
cthompson@bakerdonelson.com
Baker    Donelson    Bearman    Caldwell    &
Berkowitz, PC
One Eastover Center
100 Vision Center, Suite 400
Jackson, MS 39211-6391
Telephone: (601) 351-2400
Facsimile: (601) 351-2424

Melissa A. Geist (Admitted *Pro Hac Vice*)
mgeist@reedsmith.com
Reed Smith
506 Carnegie Center, Suite 300
Princton, NJ 08540
Telephone: (609) 514-5978
Facsimile: (+01) 951-0824

Stephen J. McConnell (Admitted *Pro Hac Vice*)
smcconnell@reedsmith.com
Reed Smith
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8121

*Counsel for Defendant Conagra Brands, Inc.*